ANNA D. TOPPER et al., Appellants, v. PERRY et al.

Division Two, June 19, 1906.

1. **COMMON LAW MARRIAGE: Evidence: Declarations of Deceased.** Declarations and admissions of the deceased man that he was married to and was the husband of the plaintiff, in a suit by her to quiet and determine the title to land owned by him in his lifetime, are competent evidence to establish the existence of a valid marriage according to the common law. So also are the denials of said deceased man that he was married to plaintiff, made in his lifetime, competent evidence to the contrary.

2. ———: ———: ———: **Pedigree:   Self-Interest.** Where the issue is pedigree, the general rule that self-serving statements and declarations made by the deceased during his lifetime are not admissible, does not apply. Where the issue is whether or not a valid marriage according to the common law existed between deceased and a certain other party, declarations by deceased that there was no marriage are competent evidence, as against the other party to the pretended contract, and in favor of the heirs of the deceased.

3. ———: **Necessary Elements.** To establish a valid common law marriage there must be not only reputation and cohabitation as a sequence thereof, but a present contract through words by which the man agrees to take the woman as his wife and the woman agrees to take the man as her husband.

4. ———: ———: **Sufficiency of Evidence.** The plaintiff testified that she and deceased had been engaged for a year; that deceased, as they were on the public road going to her home on the night of July 4th, said "she was his wife under obligations, and wanted to hold marriage relations with her; that at first she objected, but he persisted. She wanted to have a ceremony before they had marriage relations, and he said it was unnecessary; that marriage was simply a contract between man and woman, and that she was just as much his wife as she would be if the ceremony was said if they held marriage relations, and he insisted, and then she agreed to hold marriage relations with him, and from that time on he acknowledged her as his wife." She did not testify to any promise on her part to become his wife and there was much evidence on her part that she still regarded a ceremony as necessary. She went to her home at her brother's house, and the alleged marriage was kept secret, and she did not begin to live with him until December, when he repaired a house on his own farm, and after that they openly lived together and maintained marriage relations until his death two months later, but the evidence strongly preponderates that they were not regarded in their neighborhood as lawfully married. There was no legal impediment to a lawful marriage, and her son, insisting that there be a formal ceremony, on the man's refusal, killed him. *Held*, that the trial court, who had the witnesses before him, did not err in holding that a valid common law marriage was not established by the evidence.

Appeal from Lawrence Circuit Court.—*Hon. Henry C. Pepper*, Judge.

AFFIRMED.

*William B. Skinner* and *Henry Brumback* for appellants.

(1)   The court erred in admitting in behalf of defendants declarations of Ambrose G. Topper to the effect that he was not married to plaintiff, alleged to have been made in her absence to witnesses.  Such declarations were not against the interest of declarant, but were self-serving and were such in their nature as decedent could not have introduced in his own behalf in his lifetime, and did not become competent after his death.  Rice v. Waddell, 168 Mo. 121; Gentry v. Field, 143 Mo. 411; Tucker v. Tucker, 32 Mo. 468; Perry's Admr. v. Roberts, 17 Mo. 36; Armstrong v. Johnston, 93 Mo. App. 500; Johnson v. Burke, 103 Mo. App. 231; Hutchinson v. Hutchinson, 63 N. E. (Ill.) 1027; Criddle v. Criddle, 21 Mo. 522; Darrett v. Darrett, 38 Mo. 495; Teller v. Patten, 20 How. 125; Wood v. Carpenter, 166 Mo. 485; Railroad v. View, 156 Mo. 618.  "A reputed husband's declarations in denial of his marriage cannot be admitted to disprove it."   Hill v. Hill's Admr., 32 Pa. (8 Casey) 511; In re Moore's Estate, 9 Pa. Co. Court Rep. 338; Greenawalt v. McEnnelley, 85 Pa. St. 352.  "The declarations of husband and wife are subject to the same rules of exclusion which govern their testimony as witnesses."  1 Greenleaf, 341; Gaines v. Reef, 12 How. 534; Hoffman v. Hoffman's Exr., 126 Mo. 496.  These declarations were inadmissible, too, as against the minor plaintiff, Ambrose Topper, Jr.  Wood v. Carpenter, 166 Mo. 485.   (2)   The court erred in rendering judgment in favor of defendants.  The judgment is not supported by the evidence, but is contrary thereto.   Dyer v. Brannock, 66 Mo. 391; Cargile v. Wood, 63 Mo. 51; Adair v. Mette, 156 Mo. 496; Green v. Green, 126 Mo. 17; 1 Bishop, Marriage and Divorce, sec. 229; Orthwein v. Thomas, 21 N. E. (Ill.) 431; Ashford v. Ins. Co., 80 Mo. App. 643; Adger v. Akerman, 115 Fed. 124.

*John T. Burgess* and *French & Mayhew* for respondents.

Here is a case where plaintiffs sought to show that the deceased Topper was introducing plaintiff as his wife and holding her out to the world as such; this could only be refuted by showing the contrary, and instead of admitting the fact that she was his wife he was constantly saying she was not, and therein lies the distinction between this case and authorities cited by the appellants. Statements of the deceased were admissible to refute the reputation of his marriage. Cargile v. Wood, 63 Mo. 501. It is competent to show in defense of a common law marriage that the deceased made declarations, either verbal or written, that he was single and unmarried. Imboden v. Trust Co., 111 Mo. App. 220; Berkeley Peerage Case, 4 Camp. 415; Cope's Admr. v. Pearce, 7 Gill. 247; Craufurd v. Blackburn, 77 Am. Dec. 323, 17 Md. 49. When a man and woman are living together, in apparent matrimony, so they are accepted by the community as husband and wife, they are presumed, in the absence of counter presumptions of proof, not to be violating the due order of society, and breaking the law, but to be in fact married. 1 Bishop, Mar. Div. and Sep., sec. 932; Adair v. Mette, 156 Mo. 512. In this case it was quite to the contrary. Something like twenty of the near neighbors were called as witnesses, and all swore that they understood that they were not married, but on the contrary were living in adultery, so much so that some of them called on Mr. Topper and talked to him about it. Although the law does not admit hearsay evidence in proof of a fact which is susceptible of proof by witnesses who can speak from their own knowledge, yet questions of pedigree embrace not only descent and relationship but the fact of birth and marriage as well. 22 Am. and Eng. Ency. Law (2 Ed.), 640, 645, 647; Williams v. Williams, 46 Wis. 480; Spencer v. Pollock, 17 L. R. A. 850. Neither

cohabitation nor reputation of marriage is marriage. Yardley's Estate, 75 Pa. St. 211; Hunt's Appeal, 86 Pa. 296; Richard v. Brein, 73 Pa. 140. Mere acknowledgment of the relation of husband and wife made idly or to ward off prosecution or to stifle inquiry or to evade criticism is of little or no weight. West v. State, 1 Wis. 186; Schouler on Domestic Relations (5 Ed.), sec. 26; Wolverton v. State, 16 Ohio 173. In establishing a common law marriage reputation as to cohabitation may be shown but this must be a general reputation of the parties being husband and wife, and a conflict in such repute will not establish a marriage. Ashford v. Ins. Co., 80 Mo. App. 638; Cargile v. Wood, 63 Mo. 501; 2 Greenleaf on Evidence (16 Ed.), pp. 526, ·527, 528, 529; Stats v. Cooper, 103 Mo. 266; Dysart v. Perrage, 6 L. R. A. 715; Imboden v. Trust Co., 111 Mo. App. 220. What the parties by their actions deny the law will not affirm. Becken's Appeal, 2 Brewster 202. The relation of cohabitation and reputation of marriage must be undisputed at all times and in all places openly admitted by both parties. Terry's Estate, 58 Minn. 268; Powers v. Chamberry, .35 La. Ann. 630; Arnold v. Cheseborough, 58 Fed. 833; Ashford v. Ins. Co., 80 Mo. App. 638; Yardley's Estate, 75 Pa. St. ·207; McKenna v. McKenna, 180 Ill. 577.

GANTT, J.—This is an action brought to determine the title to certain real estate in Lawrence, Barry and Laclede counties, Missouri, under section 650, Revised Statutes 1899.

The plaintiffs claim title to said real estate: the said Anna, a life estate by way of homestead and dower as the widow of Ambrose G. Topper, deceased, by virtue of a common law marriage; and the minor, an estate by homestead and in fee simple as the only child and heir at law of said Ambrose G. Topper. The defendants are alleged to claim title to said real estate as heirs at law of said Ambrose G. Topper, deceased, but

plaintiffs deny that they are such heirs and that they have title, estate or interest whatsoever in said lands.

The petition prays that the court shall ascertain and determine the title and interest of the said parties respectively in and to such real estate. In their answer the defendants admit that Ambrose G. Topper died intestate, leaving no bodily heirs, and assert that the defendants are the brothers and sisters of the deceased, the father and mother being dead, and that they are the next of kin and by virtue of the statutes of this State entitled to inherit said property. Further answering the defendants say that Ambrose G. Topper, deceased, was never married to Anna D. Topper, as she now subscribes her name, neither at common law or otherwise; that said pretended marriage on the part of plaintiff to said Ambrose G. Topper, deceased, is only a pretense, and only claimed for the purpose of obtaining the property of said Ambrose G. Topper, deceased, and further answering they state that they have no knowledge whatever as to the existence of Ambrose G. Topper, Jr., and deny that any child was born to Anna D. Topper of which Ambrose G. Topper, deceased, was the father. They deny each and every other allegation in the petition.

The cause was tried at the November term, 1902, of the circuit court of Lawrence county, and taken under advisement until March, 1903, when final judgment was rendered for the defendants. A motion for new trial was filed in due time and was overruled and exceptions duly saved and an appeal taken to this court.

The evidence in substance on the part of the plaintiffs tended to prove that the plaintiff's, Anna D. Topper's, maiden name was Hoover; that at the time of the trial she was forty-four years old; that prior to her alleged marriage to Ambrose G. Topper she was the widow of one Stringer, and was residing with her brother, Mr. James H. Hoover, near Monett. She testified that her former husband, Stringer, was dead.

She had one child before she was ever married and had one child, Ernest Stringer, still living, who was born in 1879; that after Stringer's death, she made her home with her father until his death on the 13th of December, 1890, and after her father's death she resided with her mother until September 13, 1894, and after her mother's death with her brother for whom she kept house. She testified that she was first engaged to be married to Ambrose G. Topper in April, 1900; that he came to see her every Saturday and Sunday. As to her marriage with Ambrose G. Topper, she testified that he and she had been to a picnic at Aurora, and on the road home midway between Aurora and Verona, he acknowledged her to be his wife and she acknowledged him to be her husband; he said that she was his wife under obligations and wanted to hold marriage relations with her, and at first she objected, but he persisted that she was his wife. She wanted to have a ceremony before they held marriage relations, and he said it was not necessary; that marriage was simply a contract between a man and a woman, and that she was just as much his wife as she would be if the ceremony was said if they would hold marriage relations, and he insisted and so then she agreed to hold marriage relations with him, and from that time on he acknowledged her as his wife. This was on the night of the 4th of July, 1901. The marriage between Mr. Topper and her was kept secret, and she continued to live with her brother, Mr. Hoover, just as she had prior to the 4th of July, 1901, but it was talked in the neighborhood and they were accused of being married, and she was called Mrs. Topper. On December 9, 1901, she went to live with deceased Topper, on his farm east of Monett. Before moving into the house on the farm, it was necessary that the same be repaired. Topper had used it for a granary to store his wheat and corn. He went to work to have the house repaired; during that time he was boarding at Mr. J. H. Hoover's. When they got ready to paper the house, he

asked her if she could not come down and help him paper it, and she agreed to do so. She went to Pierce City and bought the material and then helped him and the young man put the paper on the house. Finally when they got ready to move into the house, they moved all of her things from her brother's down to his place and from that time she continued to live with him. She stated that Mr. Topper told her that some of the neighbors were coming to his house and they would be asking questions and he told her to tell them that they were married. She stated that after they moved into the house she insisted that they have a ceremony performed, and he said it was not necessary, he said, ''Annie, you are just as much my wife as Katie is old Bill Jones's wife,'' and said, ''I will show you,'' and he went up stairs and got a book from his trunk and brought it down and read to her that marriage was just a contract for her to agree to be his wife and for him to agree to be her husband. He said that that was all there was of it; that the ceremony was mannish, that it did not amount to anything. She testified that it was true that she was trying to get Topper to have a ceremony performed; that their relations were just the same as if she was his wife; she was not satisfied. She was going to hold on to her contract, was going to follow him and go with him just the same as if the ceremony was said; that he was good to her, and held out all the time he would be a man, and was going to carry out all of his obligations. Her son, Ernest Stringer, killed Mr. Topper. She was asked if he did not kill him over this question of Topper refusing to marry her according to law, and she answered, they did talk of having the ceremony performed and Mr. Topper had been out to Mr. Jones's in the evening, he was awful angry and threatened to kill Ernest. Ernest asked him what he meant by telling Jones he was going to fix him (Ernest), and Mr. Topper said, he meant what he said, and got a shot gun and Ernest got behind her and

began to shoot. Ernest insisted upon Mr. Topper procuring a marriage license, and offered to go himself to Mt. Vernon and get it. Mr. Topper said he would attend to his own business. She testified that during her stay at Topper's residence, she slept with Mr. Topper part of the time and part of the time in another room. She named a number of people who addressed her as Mrs. Topper in the presence of Mr. Topper, and that he made no objections to it. Other witnesses testify that they had said to Mr. Topper that they had heard that he was married and he said, "Yes, he was married." Others testified that they had been at his house and that he and the plaintiff were living just like man and wife live. One woman, Mrs. Jones, said she talked to him about the relations he bore to Mrs. Stringer, and he said it was no one's business the way they were living but their own, and that they were man and wife in the sight of God. There was a great deal of talk in the neighborhood about them living together without a marriage ceremony, and the ladies in the neighborhood would not visit her on that account. Other neighbors testified to seeing them riding around the neighborhood in a buggy together. On the part of the defendants various other witnesses testified that Topper said to them that he was not married to plaintiff. Various other witnesses testified that they were not reputed to be married by the neighbors in the neighborhood.

P. C. Watson testified that he wanted to buy some ground from Topper in Monett and Topper agreed to sell it to him, whereupon Watson said to him, "It is rumored that you are married, and if you are, we want your wife to come down and sign the deed," and Topper said, "He was not married and his title would be good." Other witnesses testified that they were reputed to be married. All or nearly all of these witnesses testified that they understood that to be lawfully

married it was necessary to have a license and have the ceremony performed by a justice or a priest.

The testimony was that Ambrose G. Topper, Jr., the minor plaintiff in this case, was born March 31, 1902, and Ambrose G. Topper, deceased, was killed February 14, 1902. Other facts may be noted in the course of the opinion.

Two propositions are advanced by the plaintiffs to reverse the judgment of the circuit court. The first is that the circuit court erred in admitting on behalf of the defendants, statements and declarations of Ambrose G. Topper, to the effect that he was not married to the plaintiff, alleged to have been made in her absence, to various witnesses, on the ground that such declarations were self-serving, and such in their nature as Ambrose G. Topper could not have introduced in his own behalf in his lifetime, and did not become competent after his death; and, *second*, that upon the whole evidence the court erred in rendering judgment in favor of the defendants.

I. The right of the plaintiffs to the lands in suit depends, of course, upon whether there was a valid marriage according to the common law, between plaintiff Anna and Ambrose G. Topper, deceased. Upon this issue plaintiffs assumed the affirmative and offered, among other things, evidence of the declarations and admissions of Ambrose G. Topper that he was married to the plaintiff Anna; that those declarations and admissions were competent there can be no doubt whatever under the long line of adjudications in this country. But the defendants on their part also offered evidence that Ambrose G. Topper in his lifetime on various occasions stated that he was not married to the plaintiff Anna, and these statements of the deceased were admitted by the circuit court over the objections and exceptions of the plaintiffs, and it is this ruling of the court which forms the basis of the first assign-

ment of error.  This evidence pro and con was directed to the proof of the acknowledgment by Ambrose G. Topper that plaintiff Anna was his wife.

In Cargile v. Wood, 63 Mo. l. c. 506, this court, in discussing this point, said: "The evidence adduced by the defendants strongly tends to show that Cargile, after he came to this State, treated Cynthia as his wife by holding her out to the community as such on all occasions; that he introduced her as his wife, requesting people to visit her, paid her bills, and applied to her in the presence of others such titles as husbands are accustomed to apply to their wives. . . . On the other hand, the plaintiffs introduced a strong array of testimony in contradiction to the defendants' evidence, and which tended to prove that Cargile and Cynthia were never married; that on many occasions they both declared they never had been married, and that Cargile said he never would marry her." It is true in that case, no objections or exceptions were taken to the introduction of Cargile's statements that he was never married, and that he would never marry Cynthia.

In the very recent case of Imboden v. Trust Company, 111 Mo. App. l. c. 235, this question arose and was directly in issue, and the Court of Appeals said: "To rebut this evidence [that is, evidence tending to prove declarations of Imboden that they were married] the respondent offered evidence, over the objection of appellant, that Imboden, after the alleged contract of marriage, and not in the presence of appellant, made oral and written declarations that he was single and unmarried. . . . The admission of this testimony is assigned as error. In the Berkeley Peerage Case, 4 Camp. 415, Lord MANSFIELD said: 'From the necessity of the thing, the hearsay of the family as to these particular facts (marriage, birth and the like) is not excluded' if made before the dispute has arisen. In Cope's Admr. v. Pearce, 7 Gill 247, it is said: 'The term "pedigree" embraces not only descent and rela-

tionship, but also the facts of birth, marriage and death, and the times when these events happened,' and that in case of pedigree, the declarations of the deceased persons and of deceased members of the family are admissible to prove *per se* not only the issue but the fact of marriage. In Craufurd v. Blackburn, 77 Am. Dec. 323, 17 Md. 49, the plaintiff, to obtain letters of administration on the will of Dr. David Craufurd, offered testimony to show that he was the son of Thos. B. Craufurd, deceased, who was the son of Dr. David Craufurd. The maiden name of the mother of plaintiff was Betsy Taylor. To prove that she was lawfully married to Thos. B. Craufurd, the appellant offered, with other evidence, the declarations of Thos. B. Craufurd, made on several occasions, to the effect that Betsy Taylor was his wife; and also called his mother to the stand, who testified that she and Thos. B. Craufurd were married by a Catholic priest in the city of Washington, in 1835. To rebut this evidence, the appellee offered the declarations of Thos. B. Craufurd, made in the year 1837, and afterwards, that he was not married to Betsy Taylor. The circuit court admitted this evidence over the objections of the appellant. On appeal, in respect to this character of evidence, the court said: 'This objection arises from a misapprehension of the rule. Such declarations are not held to be admissible or inadmissible according to the necessity of the particular case; but they are admitted as primary evidence on such subjects by the established rule of law, which, though said to have had its origin in necessity, is universal in its application. Nor do such declarations stand upon the footing of secondary evidence, to be excluded where a witness can be had who speaks upon the subject from his own knowledge. "Hearsay evidence" is of course inadmissible, if the person making the declaration is alive and can be called. But the declarations of a deceased mother, as to the time of the birth of her son, are admissible, though the father

is living and not called.' The ruling in this case was followed in Jones v. Jones, 36 Md. 457, and Barnum v. Barnum, 42 Md. 305. In Jewell v. Jewell, 42 U. S. 219, it was held that the declarations of a deceased member of the family that the parents were never married were admissible in evidence, and that an advertisement in a commercial paper, at the place of residence of the parties, inserted immediately after the separation, was a part of the *res gestae* and admissible in evidence to rebut the evidence of marriage. The Jewell case was followed in Fulkerson v. Holmes, 117 U. S. 1. c. 397.'' In view of the foregoing authorities, the Court of Appeals said: ''The declarations of Imboden, both written and oral, made after the alleged marriage, 'that he was single and unmarried, were admissible to rebut the testimony offered by appellant to prove the marriage.''

In Greenawalt v. McEnelley, 85 Pa. St. 352, evidence as to the admission of the deceased husband of the marriage was admitted, and also evidence to the contrary. On this point the court charged the jury as follows: ''Coming then to the question of admissions of the parties, they may be looked upon either as in corroboration or negation of the allegation made by Mrs. Gilson as to the fact of the marriage. It is testified by a number of witnesses that Benjamin Guffey at various times made admissions to different witnesses that he was married to this lady; and there are also in evidence admissions of a contrary character, or rather denials by him, of the fact that he was married. The admission of Benjamin Guffey of the fact of his marriage would be against his interest, and if once established to have been repeatedly made, under circumstances evincing their truth, and not mere casual or jocular expressions, they would be of great weight. Denials, however, by him, of his marriage are declarations in his own favor, and are entitled to little weight to contradict his admissions in opposition to his in-

terest. Therefore, under these suggestions, you will look at the question of his admissions, which, as we have stated, are against his interest, and are entitled to great weight, and also take into consideration his denials of the fact of his marriage, which, as we have stated, are declarations in his own favor, and are entitled to little weight in opposition to admissions against his interest.'' This declaration of law was approved by the Supreme Court. It is evident from the whole case that the court regarded the denials of the deceased of his marriage as competent, but submitted their weight to the jury for their consideration.

We are cited to numerous cases by counsel for the plaintiffs to establish the general proposition that declarations against interest are admissible, but declarations in support of interest are not admissible, because self-serving. As to this general proposition, there can be no doubt, under the decisions of this court, but the question here is one of pedigree, which we have seen by numerous decisions, is taken out of this general rule. We are cited by counsel to Hill v. Hill's Admr., 32 Pa. St. 511, in which the court excluded declarations of the decedent to disprove his marriage with the plaintiff, but a reading of that case will indicate that the court based its ruling upon the ground that there had been no attempt to prove the marriage by reputation, and the testimony was not, therefore, competent to meet anything which had been proved by the plaintiff. There is no discussion whatever of the principle of law involved on this point, but any way it is clear that the Supreme Court of Pennsylvania did not regard that case as in conflict with its subsequent decision in Greenawalt v. McEnelley, 85 Pa. St. 352, nor do we regard the decisions in Hoffmann v. Hoffmann's Exr., 126 Mo. l. c. 496, and Wood v. Carpenter, 166 Mo. l. c. 485, as applicable to the question now under consideration.

In our opinion the evidence as to the denials of

Ambrose G. Topper to his having been married to plaintiff Anna, was competent evidence. We think the decision of the St. Louis Court of Appeals on this question, in Imboden v. Trust Co., correctly declares the law.

II. But it is insisted that the judgment of the circuit court is not supported by the evidence.

In Cargile v. Wood, 63 Mo. l. c. 512, the law in regard to proof of marriage at common law when questions of the legitimacy of children and the devolution of property right are involved, was fully considered by this court. In that case WAGNER, J., speaking for this court, said: "Where parties have cohabited together and held themselves out as man and wife, and there are circumstances from which a present contract may be inferred, the law, out of charity and in favor of innocence and good morals, will presume matrimony. The law in general presumes against vice and immorality, and on this ground holds acknowledgment, cohabitation and reputation presumptive evidence of marriage. Mere cohabitation is not usually considered sufficient."

Bishop lays down the doctrine that "cohabitation, and the reputation of being husband and wife, are usually considered together in questions concerning the proof of marriage; the one being, in a certain sense, the shadow of the other. Some of the authorities favor the idea that reputation of itself may be received as sufficient proof prima-facie, but it must be uniform and general; if there is a conflict in the repute, it will not establish the marriage. On the other hand, its sufficiency in any case has been denied, unless there be accompanying proof of cohabitation" [1 Bishop, Marriage and Divorce (5 Ed.), sec. 438.]

"Cohabitation and reputation are at best only presumptive proofs, and when one of these foundations is withdrawn, what remains is too weak to build a pre-

197 Sup.—35

sumption on. There is good sense in the Scotch law, by which cohabitation alone is considered insufficient, and which requires in addition 'habit and repute,' because, it is said, the parties may eat, live and sleep together, as mistress and keeper, without any intention of entering into marriage.''

It is well established in this State that a marriage without observing the statutory regulations, if made according to the common law, is a valid marriage, and that by the common law, if the contract be made *per verba de presenti* it is sufficient evidence of a marriage, or if it be made *per verba de futuro cum copula,* the cohabitation is presumed to be on the faith of the marriage promise. That is, however, merely a rule of evidence, and it is always competent, in such cases, to show by proof that the facts are otherwise. Under our law marriage is a civil contract, by which a man and a woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge towards each other the duties imposed by law upon such relation. Each must be capable of assenting and must, in fact, consent, to form this new relation. When the consent to marry is manifested by words *de presenti,* a present assumption of the marriage status is necessary. [State v. Bittick, 103 Mo. l. c. 191; State v. Cooper, 103 Mo. l. c. 271; Dyer v. Brannock, 66 Mo. 391; Cartwright v. McGown, 121 Ill. 388.]

In McKenna v. McKenna, 180 Ill. 577, the question of the sufficiency of a common law marriage was the point in decision. In that case the action was for separate maintenance by Julia McKenna against James McKenna, on their claim of an alleged common law marriage contract. The plaintiff testified that the defendant came to her room, and she told him he must leave the room, and he said he would not, she said he could not stay there and he said he would, she said he could not stay there and he said, ''Well, we are much

as man and wife now; I take you as man and wife before God and man,'' and he lifted his hands, and she said, if he was to stay in that manner, certainly she would let him stay, and he stayed all night. Speaking of this, the Supreme Court of Illinois said: ''Here there was no assent on her part. . . . The words here spoken are not equivalent to a promise on her part to become his wife. She merely 'let him stay.' The words are no stronger than those used in Hantz v. Sealy, 6 Binn. 405. In that case the plaintiff and the defendant had long lived in adulterous intercourse although they considered themselves lawfully married. In fact, they had entered into a marriage contract, which was void, because the defendant had a former wife living from whom he had been separated by consent, but not legally. After a legal divorce was procured they were advised by their lawyer to celebrate a new marriage. The defendant said, 'I take you (the plaintiff) for my wife,' and the plaintiff, being told if she would say the same thing the marriage would be complete, answered, 'To be sure; he is my husband good enough.' The court held that these words of the woman did not constitute a present contract, but alluded to the past contract, which she always asserted to be a legal marriage. Nor do the facts as established by the evidence bring the case within the rule declared in Elzas v. Elzas, 171 Ill. 635. There the common law marriage was sustained, but the man accepted the woman as his wife and she then and there accepted him as her husband.''

Now when we compare the plaintiff's evidence as to what occurred when she claims the marriage between her and Ambrose G. Topper was entered into, it will be seen that there was no more a mutual agreement between the parties in the present tense than in either of the above-mentioned cases. She says that on the road home between Aurora and Verona, ''He said that she was his wife under obligations; and wanted to hold

marriage relations with her, and at first she objected, but he persisted she was his wife. She wanted to have a ceremony before they held marriage relations, and he said it was not necessary; that marriage was simply a contract between a man and a woman and that she was just as much his wife as she would be if the ceremony was said if they should hold marriage relations, and he insisted, and then she agreed to hold marriage relations with him, and from that time on he acknowledged her as his wife." It will be seen that as in McKenna v. Mc-Kenna, she does not testify to any promise on her part to become his wife, but simply to have marriage relations with him upon his assertion that she was his wife. There was abundant evidence on her part that she still regarded a ceremony as necessary, and that because of his refusal to obtain a license and have a marriage performed, a difficulty arose between him and the son of the plaintiff, Ernest Stringer, in which the latter shot and killed Ambrose G. Topper. Now the proof as to the assumption of the marriage status was that the alleged marriage was kept secret. According to plaintiff Anna's testimony, it was entered into on the 4th of July, 1901, but they never openly began to live together until the 9th of December, 1901. On the question of the reputation that the plaintiff Anna and Ambrose G. Topper was married, we think the evidence strongly preponderates that they were not regarded in their neighborhood as lawfully married. The ladies in that neighborhood refused to visit her, and there was so much adverse criticism of their conduct that one of the neighbors remonstrated with Topper and insisted that he have a marriage ceremony performed. Clearly the reputation in this case was wholly insufficient under the rule laid down by Bishop and approved by this court in Cargile v. Wood, to-wit, that "if there is a conflict in the repute, it will not establish the marriage." The learned trial court had all these facts before it to determine whether there was a valid common law mar-

riage between the plaintiff Anna and the deceased Topper, and he finds there was none. In determining whether he erred in so finding, it must be borne in mind that he had the witnesses before him and could observe their manner of testifying and had exceptional opportunity to weigh their evidence in the light of the requirements of the law as to the essentials of a valid common law marriage. It must be remembered that the only testimony to the contract itself was that of the plaintiff Anna, and the court as a trier of the facts, may have discredited her evidence, at least, in part, or he may have reached the conclusion from her own statement of what occurred on the night of the 4th of July, 1901, that there was no mutual agreement in the present tense between her and the deceased to be man and wife, or that the cohabitation between them was upon the faith of any such agreement. Certainly there was no such assumption of the marriage status after that night for over four months that would indicate that these parties regarded themselves as man and wife from and after that night. There was no such open and continued cohabitation and holding themselves out to the world as man and wife, as usually characterize the marriage relation. When the whole evidence in the case is considered together, the age of the parties, the fact that there was no legal impediment to a lawful marriage, if they so desired, and the ease with which a license could have been obtained, and the ceremony performed, and the insistence on the part of the plaintiff Anna that a ceremony should be performed, we do not think we would be justified in holding that the circuit court was not authorized to find, as a matter of fact, that the deceased, Ambrose G. Topper, never entered into a marriage contract with the plaintiff Anna, notwithstanding the cohabitation, which unquestionably was maintained by them for the two months during which she lived in his house.

For these reasons the judgment of the circuit court is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.