### DERRELL v. UNITED STATES et al.
#### No. 5569.

United States District Court
E. D. Missouri, E. D.

Jan. 12, 1949.

Paul H. Koenig and Edward W. Fredrickson, both of· St. Louis, Mo., for plaintiff.

Drake Watson, U. S. Atty., of New London, Mo., and William V. O'Donnell, Asst. U. S. Atty., of St. Louis, Mo., for defendant.

Donald Gunn, of St. Louis, Mo., for third-party defendant Mrs. Bytha Hooker Rhodes.

Olan R. Van Zandt, of Sherman, Tex., and Thompson, Mitchell, Thompson & Young, and Harold I. Elbert, all of St. Louis, Mo., for third-party defendant Mrs. Bessie Boucher.

Roberts P. Elam, of St. Louis, Mo., guardian ad litem for third-party defendants James Dalton Hooker, Jr., Donald Leslie Hooker, and Derrell D. Wayne Hooker, minors.

HULEN, District Judge.

Plaintiff and defendants (excepting United States of America) claim proceeds of insurance policies issued by the Government under the National Service Life Insurance Act, 38 U.S.C.A. § 801 et seq., on the life of Jack Derrell (James Dalton Hooker alias Jack Derrell), who died in the military ·service on March 18, 1945. This proceeding was instituted against the United States by Dacle Derrell, claiming to be the widow of insured and beneficiary named in policies. By answer the Government put in issue the claim of plaintiff and interpled third-party defendants as claiming some interest in proceeds of the policies.

Third-party defendants charge plaintiff was never legally married to insured and is not within the classes of beneficiaries permitted under the Act. Defendant Mrs. Bessie Boucher is a paternal aunt of the insured and claims the insurance proceeds as one in loco parentis to the insured and as contingent beneficiary in the policies. Remaining third-party defendants contend Mrs. Boucher never stood in loco parentis to the insured. Defendant Mrs. Bytha Hooker Rhodes, first wife of insured, claims the proceeds of the policies as his widow. Defendants James Dalton Hooker, Jr., Donald Leslie Hooker, and Derrell D. Wayne Hooker are minor children of Jack Derrell by his first marriage. Their position is, Bytha Hooker Rhodes ·having abandoned her husband and participated in at least two bigamous marriages forfeited her

rights as widow of insured and does not come within the meaning of the term "widow" as used in the Act, and as the only children of the insured they are the persons qualified under the Act as beneficiaries to receive the proceeds of the insurance policies in issue. The Government is impartial between the contending parties.

The Government admits that upon the death of Jack Derrell there was payable, subject to the provisions of the policies, the sum of $10,000. All parties admit that prior to institution of this suit $352.64 had been paid by the Government to plaintiff on the policies and the balance due is $9,647.36.

The background of certain of the principals concerned bear upon the issues, the credibility of witnesses, and the weight to be given to certain phases of the evidence.

Jack Derrell (as James Dalton Hooker) was born in 1908. At the age of 14 his mother died. It made a profound impression upon him. His father thereafter took little or no interest in his welfare. He was maintained and cared for by his aunt, Bessie Boucher. He grew to manhood as a shiftless, irresponsible individual lacking in moral concepts. In 1927 he married Bytha Rhodes. The marriage was a failure by all standards. Three children, James Dalton Hooker, Jr., Donald Leslie Hooker, and Derrell D. Wayne Hooker, were born during the eight years of the marriage. The family moved from place to place and finally broke up due to the characters of the father and mother. They separated in February, 1935. Mrs. Boucher attempted to take care of the father and children but was unable to do so. The youngest of the three children was turned over to "someone" and his whereabouts is now unknown. The next oldest lived with a family by the name of Walker in Texas. The oldest is in the United States Army. There was a total lack of interest by the father or mother in the children after separation. Bytha Rhodes testified that she never instituted divorce proceedings and was never served with any divorce papers by her husband. She entered into two subsequent marriages during her husband's life and apparently has married twice since the death of in-

sured, once subsequent to the filing of her answer in this case.

Dacle Derrell appears in the life of Jack Derrell about 1939. At that time Jack Derrel brought her to the home of his aunt, Mrs. Boucher. They stayed at the home several days and occupied a room as husband and wife until the aunt learned they were not married and remonstrated that the relationship could not continue in her house. On this occasion the aunt told plaintiff that they could not be legally married because Jack Derrell had a wife and three children. At this time plaintiff falsely represented she was married to insured in Yuma, Arizona. No such claim is now made. The evidence indicates that thereafter plaintiff and Jack Derrell continued their illicit relationship until a marriage ceremony was performed on September 6, 1942, at Fort Smith, Arkansas. On the application for the marriage license signed by plaintiff and Jack Derrell, Derrell represented himself as never having been married. Plaintiff gave no testimony of any character indicating she had knowledge of any divorce proceedings by Jack Derrell during the time of her acquaintance with him. A short time before his death and while the insured was in France, with no opportunity thereafter during his lifetime to obtain a divorce, he wrote a letter to Mrs. Boucher stating that he had never divorced his first wife and knew that his marriage to plaintiff was without validity.

## I.

We pass to plaintiff's claim. All third-party defendants assail plaintiff's marriage on the ground of the insured's prior marriage to Bytha Rhodes. Plaintiff and insured went through a marriage ceremony in Fort Smith, Arkansas. Plaintiff's claim must stand or fall on the validity of this marriage. She is named in the policies of insurance as first beneficiary and comes within the class of beneficiaries permitted by the Act if the marriage was legal.

▮ There are certain well-recognized rules of law applicable. A marriage void where contracted is void elsewhere. Henderson v. Henderson, 265 Mo. 718, 178 S.W. 175. The validity of a marriage is to be determined by the law of the place where it

is contracted. Franzen v. E. I. Du Pont De Nemours & Co., 3 Cir., 146 F.2d 837. The law of the State of Arkansas is substantially the same as the law of Missouri as to presumption of validity attaching to the second marriage. That law, as we understand it, is, the burden of proof is always on the party attacking the validity of the second marriage. All presumptions are in favor of the second marriage. The party having the burden of proof must overcome every presumption in favor of the marriage alleged to be invalid. There is a corollary to the presumption. The law presumes morality and not immorality; marriage and not concubinage; legitimacy and not bastardy. Validity of the second marriage being under attack its invalidity cannot be found unless the parties holding the burden complete a chain of evidence which not only demonstrates validity of the earlier marriage and its subsistence at the time of the later marriage, but which will exclude every indication or suggestion which might conceivably rescue the second marriage from invalidity. See Osmak v. American Car & Foundry Co., 328 Mo. 159, 40 S.W.2d 714, 77 A.L.R. 722. It follows the presumption is a rebuttable one. Ribas v. Stone & Webster Engineering Corporation, Mo.App., 95 S.W.2d 1221. In Gray v. Gray, 199 Ark. 152, 133 S.W.2d 874, 876, the Court observed:

"The rule, however, has its limitations, and must give way to reality when facts opposing the presumption are presented. This is true in respect of all presumptions—the term 'presumption' being used to signify that which may be assumed without proof, or taken for granted. It is defined as something asserted as a self-evident result of human reason and experience."

In the Gray case, a contest over a deceased husband's estate between a wife by a first marriage and one relying upon the presumption of validity of the second marriage, the Court, after stating the law that arises in favor of the validity of the second marriage as against a former marriage, stated:

"The theory upon which the principle rests is that no man is presumed to do an unlawful act. 'The law presumes morality, and not immorality, and that every intendment is in favor of matrimony.'"

If any presumption in favor of morality remains in this case in favor of plaintiff it is a weak one, if not a myth. The testimony of insured's aunt, Mrs. Boucher, that plaintiff and insured came to her house in 1939 and lived together there for several days under circumstances testifying to utter disregard of the most elemental concepts of morals, decency, and respect for insured's aunt, was not denied by plaintiff. The aunt by her appearance and testimony in this case impressed me as of good character, kind and generous to a fault. Finally she could no longer tolerate the presence of plaintiff and insured, under such circumstances, in her house. The aunt then told plaintiff they could not continue to live together in her house, that insured was married and had three children. Plaintiff did not deny this testimony. The record is silent as to plaintiff expressing any surprise on the occasion but she made a false statement as to her marriage. Plaintiff intermittently continued her relationship with insured until the marriage ceremony.

Insured's first wife denies any divorce proceedings ever having been initiated by her or that she was ever served or had any knowledge of any divorce proceedings being initiated by the insured. Proof of the first marriage was made. If insured initiated any divorce proceedings after he left his aunt's house in 1939 with plaintiff and up to the time of the marriage ceremony with plaintiff in 1942, we think it is a fair presumption that plaintiff would have had knowledge of insured's activities in that respect. On the contrary plaintiff testified that she had no knowledge of any divorce action being taken by the insured. She relies here solely on the presumption. Of course defendants are not relieved of the burden of rebutting the presumption in favor of validity of the second marriage because of plaintiff's failure to offer evidence of a divorce proceeding, but in determining if the presumption has been rebutted we examine the whole record. We consider all the evidence, regardless from whom it comes, and reasonable inferences to be drawn therefrom.

Plaintiff is without any foundation to claim she married the insured in ignorance of his prior marriage. On the contrary we find at the time plaintiff went through the marriage ceremony she had knowledge of insured's prior marriage and yet she joined in an application for a marriage license in which the insured represented that he had never been married. People of the station in life morally of plaintiff and insured might well have concluded if the application for a marriage license represented the truth as to insured's marriage status, as to his prior marriage, it might raise a question as to divorce and lead to an embarrassing inquiry, and to avoid any such complications it was represented in the application for the marriage license insured had never been married. Insured and plaintiff knew this statement was false.

While the policy names plaintiff as principal beneficiary in the application for insurance, and states the relationship to be "wife", we believe the letter written by insured in France shortly before his death, to his aunt, in which he told her he had never been divorced from his first wife and his second marriage was illegal, outweighs the declaration on the application, when considered with all of the other evidence in the case.[1] See Dinkelman v. Hovekamp, 336 Mo. 567, 80 S.W.2d 681, where evidence of the type just referred to was declared by the Court to recognize "continuity" of a marital relationship. The letter written by the insured shortly before his death is consistent with other facts in the case. It is consistent with the undisputed record to which we have referred. This brings us to a point in the insured's life where he was in France, shortly before his death, having no opportunity to initiate or consummate divorce proceedings, and making a solemn declaration which, if true, renders the marriage ceremony relied on by plaintiff void. We find it was. The evidence preponder-

ates in favor of its truth.[2] The marriage relied upon by plaintiff was consummated in Arkansas. As to the quantum of evidence required to make a submissible case an issue of fact, to overcome the presumption, the case of Gray v. Gray, supra, is enlightening. Without detailing at length the facts in the Gray case, the evidence showed that after the second marriage ceremony the husband continued to contribute financially to the first wife's support, that they visited each other but never lived together, and the husband denied to his first wife that he had gone through a marriage ceremony with the second wife. The first wife had visited in the home of the deceased while he was living with his second wife. On this record the Court held the evidence sufficient to go to the Jury "and its finding that there had been no divorce (between the deceased and the first wife) will not be disturbed."

We conclude the presumption of validity as to the marriage between insured and plaintiff has been rebutted and plaintiff therefore fails to qualify within the classes of persons permitted as beneficiaries under the Act because her marriage with insured is void because of the previous marriage of insured.

## II.

Mrs. Bessie Boucher is named as "contingent" beneficiary in the insurance policies, if plaintiff as "principal" beneficiary fails. The remaining third-party defendants contest the claim of Bessie Boucher. It is their positions Mr. Boucher never stood in loco parentis to the insured at any time prior to his entry into the military service "for a period of not less than one year" as provided by Section 601 (f) of the Act, 38 U.S.C.A. § 801(f). The Act does not define the term "in loco parentis" but the term has received judicial interpretation in cases involving questions

---

[1] As to admissibility of testimony of a witness to contents of a letter see Meier v. Meier, 105 Mo. 411, 16 S.W. 223; Topper v. Perry, 197 Mo. 531, 95 S.W. 203, 114 Am.St.Rep. 777.

[2] Under the holding of United States v. Barker, 5 Cir., 70 F.2d 1002, this fact

standing alone could defeat plaintiff's claim. "The designation of Arkansas (Arkansas Hogan, second wife) as beneficiary was invalid because, though represented to be insured's wife, she was not such in fact and he knew it. Her innocence does not make her a wife in New York."

similar to those now presented. See Leyerly v. United States, 10 Cir., 162 F.2d 79, loc. cit. 85:

"The relationship, as the term implies, is a standing in the place of, or instead of, a parent; one charged fictitiously with a parent's rights, duties and responsibilities. See Black's Law Dictionary, p. 604; Vol. 1 Bouv. Law Dict., Rawle's Third Revision, page 1522. The rights and liabilities arising out of the relationship are exactly the same as that of a parent and child. Young v. Hipple, 273 Pa. 439, 117 A. 185, 25 A.L. R. 1541; Cashen v. Riney, 239 Ky. 779, 40 S.W.2d 339; Austin v. Austin, 147 Neb. 109, 22 N.W.2d 560; Fitzpatrick v. Hudson Coal Co., 159 Pa.Super. 53, 46 A.2d 589. The assumption of the relationship is primarily a question of intention, to be shown by the acts, conduct and declaration of the person alleging to stand in that relationship. Meisner v. United States, D.C., 295 F. 866; Miller v. United States, 8 Cir., 123 F.2d 715."

The relationship does not depend strictly upon support and maintenance:

"But we think the roots of the relationship, once established, go deeper than that. It is true, support and maintenance are of the essence of natural parenthood, and would therefore constitute an essential element of artificial parenthood. But there is no good reason to hold that the relationship ceases to exist, or could not be perpetuated beyond the age of dependency, see Meisner v. United States, D.C., 295 F. 866; or that it ceases to exist simply because the child temporarily leaves the family fireside. Dix v. Martin, 171 Mo.App. 266, 157 S.W. 133. The relationship is not governed purely by pecuniary considerations. The parent cannot recover for services rendered the child, or the child from the parent, even though the child is of age and lives in a home of his own. The status, when once established is presumed to continue, and one who avers its discontinuance has the burden of proving it." 162 F.2d loc. cit. 86.

Another case containing a definition of the term and bearing upon the situation presented by the present record is Niewiadomski v. United States, 6 Cir., 159 F.2d 683, loc. cit. 686:

"The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties."

In view of the authoritative interpretation given the term "in loco parentis" we do not believe the fact, standing alone, that claimant Bessie Boucher and insured did not for a definite period of time physically live in the same dwelling is determinative. To hold the relationship of "in loco parentis" could not exist in this case because Bessie Boucher for days and weeks at a time did not occupy the same dwelling as insured would call for a narrow construction of the term and I am unwilling to apply it under the facts in this case absent authority of a higher court. Bessie Boucher's absence was not of choice but of necessity. Circumstances compelled her to work that she might devote the proceeds of her labor to the care of insured. The only work for which she was qualified, doubtless, required her absence. But during her absence she left insured under the care of her mother. Bessie Boucher did not look for reasons why she could not care for insured, but with commendable resourcefulness, energy and will, met the test as best she could. "Angels could do no more". So we hold, under the record in this case occupancy of the same dwelling quarters by the parties is not a sine qua non to create and maintain the relation of "in loco parentis" between two parties if it was the intention of the claimant to assume the duties and obligations of a parent toward insured and such duties and obligations were carried out. The question presented is—was Bessie Boucher charged with a parent's rights, duties, and responsibilities toward the insured; did Bessie Boucher discharge a parent's rights, duties and responsibilities toward the insured; was it the intention of Bessie Boucher to assume and discharge such character of rights, duties and responsibilities; were the duties, rights and responsi-

bilities of the same character as were assumed and exercised by a parent toward a child? Support and maintenance are of "the essence" of the relationship during minority, of course. The answer to these questions does not only depend upon the intention of claimant but the relationship must be shown by her acts, conduct and declaration. The facts, circumstances and station in life of insured and claimant must be considered in determining their relationship. If the care and maintenance accorded by claimant to insured was reasonably comparable to that of parents and children living in the same station in life then we cannot escape the conclusion that claimant stood "in loco parentis" to insured, if that was her intention. If not, her claim must fail. If Bessie Boucher performed the duties of a parent for insured when there was no hope of reward it would be false justice that would apply a different standard to deny an unexpected benefit which depends on it. The facts upon which the claimant Bessie Boucher relies to establish the relationship of in loco parentis are not in dispute. Bessie Boucher is the sister of insured's father. Insured was 13 years of age when his mother died in 1922. Insured's mother on her deathbed requested Bessie Boucher to take the insured and raise him as her own child. Bessie Boucher gave her promise to the dying woman. When the mother of insured died the family was living in the homestead with insured's grandmother, or Bessie Boucher's mother. Insured's father remarried a few months after the death of insured's mother and left the homestead. Insured was left there with his grandmother. Bessie Boucher, to support and care for insured and her mother, was compelled to work as a practical nurse and this character of work caused her to spend most of her time at homes of her employers. But when away she made frequent trips to the home she had provided for her mother and insured and kept in constant touch with them. She was their sole support and provided clothing and food for insured prior to his marriage. She attempted to keep him in school. She met all of insured's expenses until he married in 1927. Prior to the 1927 marriage Bessie Boucher found it necessary to move her mother and insured to another home. This was all done at her expense. She counseled the insured as a parent and to the extent of her limited resources exerted all of her power to help guide and raise insured as a good citizen. On one occasion prior to 1927 insured got into trouble over a pistol. The details are lacking, but he was arrested. Bessie Boucher went to his aid as a parent would be expected to do. At this time insured's father disclaimed any responsibility for him. After insured was married on one occasion he was injured. The appeal for help went to Bessie Boucher. She responded as a natural parent. She found the insured and his family in a destitute condition. She resettled them in another home, supplied them with provisions, and did all in her power to rehabilitate the family. Her support and maintenance of the family on this occasion continued for approximately eight months. When the insured's first wife left him with three minor children it was to Bessie Boucher that the insured turned. She took charge of the situation, established him in a home furnished by her and supported them with her meager earnings. It appears that her physical efforts on this occasion on behalf of the insured and his minor children contributed to a breakdown in Bessie Boucher's health. After the insured reached his majority he continually corresponded with Bessie Boucher. He named her as principal beneficiary in insurance carried with the Government and in another policy as contingent beneficiary, and in each case the designation in loco parentis appears in the application. While in the armed services and between enlistments he sought and received sums from Bessie Boucher. Bessie Boucher testified that from the time insured's mother asked her to take him and raise him as a son she considered him her son and tried to treat him as a son and give him the care of a mother. Bessie Boucher called the insured her son. The insured on various occasions referred to Bessie Boucher as "Mom—Momsy". Bessie Boucher's material support and care of insured lacked luxury. It was plain. But judged by her resources it was all she had. From her hands and by her labor insured was decently fed, clothed and housed.

She counseled him as a mother. She did her best to keep him in school. She it was who was called when he was in trouble and not once did she fail promptly and effectively to respond even when it meant hardship and sacrifice. Many parents with more could do less under the circumstances and not be subject to criticism for failure to perform their parental duties. Only when Bessie Boucher's health failed—and that due to her untiring efforts to serve insured and his children—did she falter in keeping the promise made to insured's mother. The evidence of appreciation by insured is meager but we think it not without significance that when faced with the hazards of war he wrote to her and in that letter gave the facts of his association with plaintiff.

 We conclude that third-party defendant Bessie Boucher has established that the relationship between her and the insured, Jack Derrell, under the provisions of the National Life Insurance Act, was in loco parentis from the year 1922, and that she is the same person named as contingent beneficiary in the policies sued on in this case. The only question presented by the claim of Bessie Boucher is whether the relation between her and insured brings her within the meaning of the term "in loco parentis" to insured, for the time and during the period required under Section 801 (f) of the Act. That question answered in the affirmative, and the principal beneficiary being unable to take because not within the permitted class, there follows without question the intention of insured under the circumstances, namely that Bessie Boucher should receive the proceeds of the policies.[3] The policies and application leave room for no other conclusion.

See Zazove v. United States, 7 Cir., 156 F.2d 24, 26. Speaking of the relation and intent of the insured the Court said:

"The statute however is a remedial one and should be liberally construed in favor of the insured and to carry out his inten-

tions. McClure v. United States, 9 Cir., 95 F.2d 744; Sovereign Camp, W. O. W., v. Cole, 124 Miss. 299, 86 So. 802. It is clear beyond any doubt that the soldier wished the plaintiff to receive the insurance. Did Congress use the words in loco parentis as descriptive words, or did it use the words with the common-law limitation upon them, namely that the relation could not exist unless the insured were a minor? We find no limitation in the words of Congress. We think they were used as descriptive words and were not to be restricted to the 'stick in the bark' legal connotations usually attached at common law."

In view of the conclusions above set forth it is not necessary to pass upon the remaining claims of third-party defendants.

Third-party defendant Bessie Boucher may submit findings of fact, conclusions of law and form of judgment.

Guardian ad litem, Roberts P. Elam, appointed by the Court to represent the minor third-party defendants, may make application for allowance so that ruling in respect thereto may be incorporated in final judgment.

---

[3] One policy for $5,000 with Bessie Boucher as "loco parentis" named as principal beneficiary was issued and discontinued November 1, 1942; thereafter an $8,000 policy was issued with plaintiff as "wife" as principal beneficiary and Bessie Boucher as "aunt" as contingent beneficiary; insured then paid premium due on a $10,000 policy; after insured's death obligation for additional $2,000 was admitted.