Bruce Crosson and Barbara Crosson were married in February 1982 in a ceremonial marriage. The Crossons were divorced in June 1993. It is undisputed that after the divorce Mr. Crosson asked his former wife to come back and be his wife. Mrs. Crosson (the "wife") accepted the invitation to move back in with Mr. Crosson (the "husband").[1] They began living together in August 1993.
Unknown to the wife, the husband married another woman in October 1994. Upon discovering that fact, the wife immediately sued for a divorce from the husband, contending that she was his common-law wife, and that he had committed adultery and bigamy, and that there was an irretrievable breakdown of the marriage.
The trial court found that the wife had failed to prove a common-law marriage and dismissed her complaint for divorce. At the conclusion of the testimony, the trial court stated:
 "When these [elements of common-law marriage] are met there is a presumption that a man and woman are married, however, that presumption does not exist where the parties are separated and one of the parties marries under a legal marriage. That is subject to rebuttal but it takes a very strong rebuttal to reach to the level of common law marriage to basically void a legal marriage or a ceremonial marriage. . . . [B]ased upon the testimony that has been presented the court has no recourse but to find that there did not exist a common law marriage at this time in this case and dismiss the petition for divorce."
The trial court's final judgment simply stated, "The Plaintiff's Complaint for Divorce is hereby DISMISSED, the Plaintiff having failed to prove the existence of a common law marriage." The trial court, in reaching its decision, applied this principle of law stated in White v. White, 225 Ala. 155,158, 142 So. 524, 526 (1932): "[T]he presumption of an actual marriage from the fact of cohabitation, etc., is rebutted by the fact of a subsequent permanent separation, without apparent cause, and the actual marriage soon after of one of the parties." (Citations omitted.)
We must determine if the trial court erred in finding that a common-law marriage did not exist between the parties, on the basis that the husband's marriage to another vitiated the presumption of the common-law marriage between the parties.
The first issue is whether the parties entered into a common-law marriage.
 "This Court has recently reaffirmed the requirements for a common-law marriage in Alabama in Etheridge v. Yeager, 465 So.2d 378 (Ala. 1985). In that opinion, citing various cases as precedent, we held that while no ceremony or particular words are necessary, there are common elements which must be present, either explicitly expressed or implicitly inferred from the *Page 870 
circumstances, in order for a common-law marriage to exist. Those elements are: 1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation."
Boswell v. Boswell, 497 So.2d 479, 480 (Ala. 1986) (citations omitted). "No specific words of assent are required; present intention is inferred from cohabitation and public recognition." Waller v. Waller, 567 So.2d 869, 869
(Ala.Civ.App. 1990) (citation omitted). In Copeland v. Richardson,551 So.2d 353, 355 (Ala. 1989), our Supreme Court stated, "This Court has recognized valid common law marriages between parties who were once formally married to each other, when the proof has been sufficient to establish common law relationships." (Citations omitted.)
 I. The Boswell Criteria 1. Capacity
Both parties testified that immediately after their divorce, neither party married anyone else and that there was no other impediment to their remarriage. Therefore, both parties had the capacity to enter into the marital relationship.
 2. Present Mutual Agreement
The wife testified that she and the husband intended to enter into a marital relationship when "Bruce told me that he loved me and that he knew that he had made some mistakes, that I had taught him a very valuable lesson and that he loved me andhe wanted me to come back and be his wife and I did." (Emphasis added.) The husband did not deny making this statement. The wife returned to the husband's home that day. Both stated that while living together they had sexual relations. The wife testified that this second relationship "was a lot better" than the previous marital relationship because during their prior marriage, the husband never "accepted" her children by a previous marriage. She further testified that before living together again, they talked about this problem, and that the husband said he loved her children and that he was sorry that he had treated them as he had. During their alleged common-law relationship, the parties signed an agreement allowing the wife's daughter and her family to place a mortgaged mobile home on these parties' real property. Under the terms of the divorce, the wife still had an interest in the land. The wife testified that, except for the husband's relationship with her children, there was no difference between the relationship she and he had had before the divorce and the relationship they had after they began living together in August 1993. The wife never dropped him as a beneficiary of her health insurance. The husband maintained insurance on the wife's automobile. The husband obtained a pistol license for the wife in December 1993 by signing her name to the license, which showed her address at the home where they were living together.
This case is similar to Copeland, wherein our Supreme Court affirmed a judgment based on a finding of a common-law marriage and held that the finding of the parties' present intent to become married upon their reunification was based upon the husband's asking the wife to " 'come and be my wife.' " 551 So.2d at 355. In Copeland, the wife promised at that time that she would try harder to get along with the husband's daughters.
The husband's only contradictory testimony as to their mutual assent to be married is his testimony that he dated others and that he and the others were seen together at restaurants. He did not tell the wife, and he contends that he did not intend to enter into an agreement to get married when the wife replied "maybe" to his proposal of marriage; however, the wife moved in and began living with him on the same day. The husband's subjective intent, i.e., any unexpressed intent he may have had not to be married, must yield to the reasonable conclusion to be drawn from his objective acts such as his failure to dispute what appeared to be a marital relationship. These acts speak for themselves. McGiffert v. State ex rel. Stowe, 366 So.2d 680
(Ala. 1978). *Page 871 
Because the husband's subjective intent is insufficient to rebut the objective acts of the parties, we must take it as undisputed that when these parties began to live together they had a mutual agreement to permanently enter the marriage relationship, to the exclusion of all other relationships.
 3. Public Recognition
The husband admitted that after she moved back to his home she kept her clothes, personal belongings, furnishings, etc., at the house, and that they shared household duties. The wife did not remove her wedding band when she was divorced. In April 1994, the parties filed a federal tax return for the year 1993, stating that their status was "married filing joint return." This return included a Schedule C, "Profit or Loss From Business," for the husband's installation business, which stated a net income of approximately one half of the parties' adjusted gross income. This return was signed following this statement: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete."
The parties lived together until the wife's job required her to move to Mississippi in March 1994. The wife took an apartment in Mississippi, listing the husband as her "husband" on an application for utilities. Upon the husband's first visit to the wife's apartment, he went to the office where she worked to obtain a key to the apartment, and the office manager asked him if he was "Barbara's husband," to which he replied, "Yes." On that occasion, the husband was driving the wife's vehicle, and her grandson was with him. The husband picked up a U-Haul truck and assisted her in moving to Tupelo. The husband and the wife saw each other on weekends, with each party driving every other weekend to the home of the other.
On several social occasions the wife introduced him as her husband, and he made no comment regarding that introduction, but now contends that he made no comment because he did not want to embarrass his wife by correcting her. The same office manager testified that at a company picnic and at the office manager's home several months after that, the husband was introduced as the wife's husband, and that he did not on either occasion deny being her husband. Another office manager testified that she attended a company Christmas party in 1993 where the husband was introduced as the wife's husband, by a company manager and by the wife, and the husband made no denial. This office manager also testified that after the divorce the husband talked with her about the separation and stated that he wanted to be back together with his wife again. This court has held that a man's knowingly allowing himself to be referred to as someone's husband, on several occasions, presented an objective manifestation of a mutual assent to be husband and wife. O'Dell v. O'Dell, 57 Ala. App. 185,326 So.2d 747 (1976).
These facts meet the required elements, stated in Boswellsupra, of capacity, present mutual agreement, and public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation, thereby, inferring consent to enter a matrimonial relationship to the exclusion of all other relationships. Waller, supra.
 II. Issues in Rebuttal 1. Discussion of Ceremonial Marriage
The husband contends that the relationship did not amount to a common-law marriage because they discussed having a ceremonial marriage, which never occurred. We disagree.
The husband admitted that on several occasions after the divorce he asked her to marry him, and she said "maybe." The wife stated that she agreed to remarry, but that they just never got around to having a ceremonial marriage. InHuffmaster v. Huffmaster, 279 Ala. 594, 188 So.2d 552 (1966), the court held that the evidence supported a finding of a common-law marriage between parties who had lived together continuously from 1933 until 1961, except for a few months in 1945 after a divorce, where the parties filed joint income tax returns as husband and wife subsequent to their divorce. As in this case, the wife in Huffmaster testified that the parties "just never did have time to get *Page 872 
around to getting married." Id., 279 Ala. at 594-95,188 So.2d at 553.
"[T]he intent to participate in a marriage ceremony in the future does not prove a couple's nonmarriage." Mattison v.Kirk, 497 So.2d 120, 123 (Ala. 1986) (citation omitted) (overruled on other grounds, Carbon Hill Mfg., Inc. v. Moore,602 So.2d 354 (Ala. 1992)). The rule was enunciated in King v.King, 269 Ala. 468, 471, 114 So.2d 145, 147 (1959), where the court said: "The mere fact that the parties could not get together on the time when and the place where they were to have another ceremonial marriage is not sufficient to overcome the presumption of the common-law marriage." In Mattison, 497 So.2d at 123, the court noted, "It is not uncommon even for ceremonially married couples to have a second marriage ceremony — a sort of celebration and renewal of marriage vows." The fact that two people are planning a wedding ceremony does not mean that they are not presently married.
 2. Dating Others
The husband contends that he could not be found to have intended to be in a marital relationship, permanent and exclusive of all others, because he had dated other women and had been seen with them in public places, although the wife had no knowledge of these actions. We disagree.
Although the husband testified that he was dating "others," he identified only one woman, Cheryl Gaddy Rollings, and he stated that he begin dating her in August 1994, one year after the wife had accepted his invitation to move in with him and become his wife. When asked why he did not tell the wife he was dating others, the husband stated, "Why should I? I don't have no ties with her. She is not — I'm not married to her."
 "Once there is a marriage, common law or ceremonial, it is not 'transitory, ephemeral, or conditional.' Once married, by common law or by ceremony, the spouses are married. There is no such thing as being a 'little bit' married; and once married, one spouse's liaison amoureuse does not end the marital status, whether that status was created by common law or by ceremony, though it may afford the other spouse a ground for judicially terminating the legal relationship."
Adams v. Boan, 559 So.2d 1084, 1087 (Ala. 1990) (citations omitted) (emphasis in original).
 3. Marriage to Another
The husband contends that his ceremonial marriage on October 1, 1994, to Cheryl Gaddy Rollings was evidence that could be considered by the trial court to rebut the presumption of an actual marriage between the husband and wife, based upon their cohabitation, etc. We disagree.
This principle, stated in White v. White, 225 Ala. 155,142 So. 524 (1932), does not apply in this case, because, as discussed above, we must take it as undisputed that when the parties resumed living together in August 1993 they fully intended a marital relationship. This occurred when the wife accepted the husband's invitation to come back and be his wife; she agreed and moved in with him that same day.
"A subsequent asserting 'we knew we were not married' by a party to such an agreement [to enter into a marital relationship] will hardly vitiate a valid marriage where theoriginal understanding was to presently enter into the marriage relationship, followed by a public recognition of the relationship." Huffmaster, 279 Ala. at 595, 188 So.2d at 554
(emphasis added).
 "[T]he operative time is when the agreement is initially entered into, and once other conditions of public recognition and cohabitation are met the only ways to terminate a common-law marriage are by death or divorce. A party cannot legally terminate the marriage by simply changing his or her mind . . . or by telling selected individuals, 'We're not really married.' "
Skipworth v. Skipworth, 360 So.2d 975, 977 (Ala. 1978) (emphasis added). The operative time, in the instant case, was when thehusband asked the wife to come back and be his wife and she did
return for that purpose.
Because we must take it as undisputed that the parties intended to become husband and wife in August 1993, and because they *Page 873 
immediately began public assumption of marital duties and cohabitation, we must conclude that a common-law marriage was formed and that the husband's marriage to another, a year later, could not "untie the knot." Therefore, the principle stated in White, and relied upon by the trial judge, is not applicable. The trial court misapplied the law to the facts, and no presumption of correctness exists as to the court's judgment. Griggs v. Driftwood Landing, Inc., 620 So.2d 582
(Ala. 1993).
 III. Conclusion
The arguments raised to rebut the contention that these parties had a common-law marriage — (1) their discussion of a ceremonial marriage, (2) the husband's dating others, and (3) the husband's subsequent marriage to another — are, as discussed before, insufficient to rebut the facts suggesting a common-law marriage. The trial court's judgment that no marriage existed between the parties is against the great weight of the evidence. Also, as stated before, the trial court misapplied the law.
The trial court's judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, YATES, and MONROE, JJ., concur.
[1] Although the determination of whether the parties are, in fact, husband and wife is before this court, for convenience, they will be referred to as such.