Lawrence D. Stringer sued for a divorce from Carolyn Davis Stringer, alleging, among other things, that the parties had lived together since 1980 and were common-law husband and wife. Carolyn answered and counterclaimed for a divorce, also alleging that the parties had lived together as husband and wife since 1980.
Following an ore tenus proceeding, the trial court held that no common-law marriage existed and denied the relief requested by both parties. Carolyn appeals; we affirm.
A valid common-law marriage exists in Alabama when the following elements are present:
 "1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation."
Boswell v. Boswell, 497 So.2d 479, 480 (Ala. 1986) (quoted inCrosson v. Crosson, 668 So.2d 868, 870 (Ala.Civ.App. 1995)).
Whether the essential elements of a common-law marriage exist is a question of fact. Johnson v. Johnson, 270 Ala. 587,120 So.2d 739 (1960); Arrow Trucking Lines v. Robinson,507 So.2d 1332 (Ala.Civ.App. 1987). In Johnson, our supreme court stated:
 "Both parties testified orally before the trial court. There was also documentary evidence bearing on the question whether there was a common-law marriage. Although [the alleged husband] testified to the effect that there had never been any agreement between him and [the alleged wife] to enter into the relationship of man and wife, there is ample evidence supportive of the trial court's finding to the contrary. As we see it, the conflicting evidence, and the conflicting tendencies to be drawn therefrom, presented a typical issue of fact to be resolved by the trial court as to whether the essential elements of a common-law marriage were established. On the record before us, considered in the light of the well-recognized presumption in favor of the trial court's finding from evidence [presented] ore tenus, we are not able to say that the court erred in its holding."
270 Ala. at 588, 120 So.2d at 740. Likewise, whether the parties had the intent, or the mutual assent, to enter the marriage relationship is a question of fact. See Mickle v.State, 21 So. 66 (Ala. 1896). Accord Krisko v. John HancockMutual Life Ins. Co., 15 Ariz. App. 304, 488 P.2d 509, 510
(1971)("whether [the] requisites [for common-law marriage, including intent] are met in a particular case is a question of fact for the trier of fact"); Jones v. International Tel. Tel. Corp., 462 So.2d 1348 (La.App. 1985) (applying Texas law) (whether the parties have the intent to be married is a question of fact).
In this case, the trial court found that the parties did not have the requisite intent and, on that issue, we must presume that the trial court's finding was correct. See Waller v.Waller, 567 So.2d 869, 870 (Ala.Civ.App. 1990). On appeal, we are not authorized to set aside the trial court's finding unless it is unsupported by credible evidence or palpably wrong. Id. In this case, the record contains evidence that supports the conclusion that the parties had no mutual assent to be married. Therefore, regardless of whether this court would have come to the same conclusion as the trial court, we must uphold the trial court's determination that no common-law marriage existed.
Lawrence Stringer testified that when he and Carolyn Davis first met each other, he was separated from his wife. He and his wife eventually divorced, and Carolyn became pregnant with Lawrence's child. Lawrence said that after Carolyn gave birth to the child, he "just didn't want her to struggle out there by herself with [their] child, so [he] told her to come on and move on in with [him]."
Lawrence testified that when he and Carolyn began living together he "wasn't ready to commit to a marriage." He stated that he had "tr[ied] to explain to [Carolyn] about the trauma behind a divorce." He said that although he "cared about [Carolyn], [he] just didn't want to commit to a marriage." Lawrence *Page 196 
testified that he did not think Carolyn understood his feelings. He explained:
 "If I cared about her, she thought that I should just be willing to, you know, marry her and accept her. And I wanted some more time . . . so I could address this thing without — with a clear head, without being so close to the time that I had married, you know, clearing myself away from this marriage. And [Carolyn] couldn't seem to understand it. And eventually, the threat of her pulling away from me, I still wanted her with me, and I wanted her. With the threat of her pulling away from me, I eventually succumbed to letting her move on in with me so she wouldn't go away from me."
Lawrence stated that he was reluctant to marry Carolyn "because [of] the old pain from the old marriage." He said that "when [Carolyn] asked about getting married, [he] gave her excuses and excuses."
The parties lived together for 15 years, had 5 children, and filed joint tax returns. Carolyn testified that Lawrence told her to sign the tax returns as "Carolyn Davis Stringer" and that she did so. Lawrence acknowledged paternity of all five children. The three oldest children have the surname "Davis" and the two youngest children have the surname "Stringer." When asked why the last two children were named "Stringer," Carolyn replied, "Because I wanted them to have [Lawrence's] last name." She explained that three of the children were named "Davis" because Lawrence had refused to pay $35 to have their names changed.
When asked why he and Carolyn "did not get married later on in [their] relationship," Lawrence replied that, at one point, they "did consider it. And we made plans [to get married]." He explained:
 "[A]bout eight or nine years ago, . . . we decided — she had been asking me about getting married and I had been feeling reluctant, like what I explained before. . . . And after more than one child was introduced into this what was now a family, I started seeing holes in what I was saying, that it's really no excuse . . . [n]ot to be married, no matter what my feelings were about this, you know, this phobia about the old marriage and all that. . . . We came to the courthouse to get married. And when we got to the courthouse, I guess [Carolyn] got cold feet, and she just decided that she didn't want to get married. Well, she used the excuse that she forgot and left her driver's license at home."
For most of the time the parties lived together, Lawrence provided the financial support and Carolyn stayed home to care for the children. Carolyn testified that after their second child was born, however, she went to work. She said that "after [she] got the job, Lawrence said that he . . . wanted to be by himself. He wanted to live alone, so [she] moved in with [her] sister." After a month, Lawrence came to her sister's house, kicked in her sister's door, and forcefully put Carolyn in his car. Saying "he wanted his family back home," he took Carolyn and the two children back to his house. Carolyn continued to work for a few more months but quit when she became pregnant with their third child.
After the one-month separation, the parties lived together continuously except for two brief periods when Carolyn and the children stayed at family violence shelters following physical abuse by Lawrence upon Carolyn.
When asked about why they did not get married at the courthouse as they had once planned, Carolyn testified that she "did not have [her] driver's license with [her] that day." When further questioned about why they did not get married "on a later occasion," Carolyn explained:
 "I asked Lawrence about getting married. [One time] I said, 'Lawrence, it's time for us to get married and get the kids a legal name.' I got some papers and I came up here for their names to be changed and Lawrence said well no one's going to force him to get married. He don't have to if he don't want to. . . . Everything belongs to him he said, and no one was going to force him to get married. It wasn't the first time I spoke with him about getting married." *Page 197 
When asked by his attorney whether he was seeking a divorce from Carolyn, Lawrence replied:
 "I am in a sense, but in reality, I'm really not. That's kind of hard, because I really don't want a divorce. I wish I . . . could have worked things out, but it doesn't seem like now it's even possible to work things out. And about the divorce, I don't think that I really deserve to give her a divorce if she didn't want to marry me. And I don't see how I really should even grant her a divorce, because she never wanted to make the marriage legal anyway, so why should I give her a legal divorce if she [did not] want to legally marry me?"
Carolyn argues that the record demonstrates a mutual assent to be married. First, she claims that, because the pleadings filed by both parties averred the existence of a common-law marriage, the trial court was bound by Rule 8(d), Ala. R. Civ. P., to treat the averments as admissions. Second, she argues that because each party occasionally referred, during the trial, to their relationship as a "marriage," or to the other party as a "husband" or "wife," those references illustrate the parties' intent. Finally, she contends that because she sought and received help under the Protection from Abuse Act, Ala. Code 1975, § 30-5-1, which provides relief to "spouses [and] persons living in common-law marriage relationships" but not to persons merely cohabiting, that demonstrates public recognition of her marital state.
Rule 8(d) did not bind the trial court to a determination that a common-law marriage existed. The trial court had subject matter jurisdiction to grant the parties a divorce only if the parties were, in fact, married. See Ala. Code 1975, § 30-2-1. A court always has the power to inquire into its subject matter jurisdiction. Menchaca v. Chrysler Credit Corp., 613 F.2d 507
(5th Cir.), cert. denied, 449 U.S. 953, 101 S.Ct. 358,66 L.Ed.2d 217 (1980). Moreover, under Rule 15(b), Ala. R. Civ. P., "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Despite the averments of his complaint, Lawrence himself offered evidence tending to show that he did not have the requisite intent to be married to Carolyn.
 "Implied consent to the trial of an issue may be found when a party fails to object to evidence offered concerning it, [or] when the party himself offers such evidence."
Hawk v. Bavarian Motor Works, 342 So.2d 355, 358 (Ala. 1977).
The fact that the parties referred during the trial to their "marriage" and referred to each other as a "husband" or a "wife" was, of course, evidence to be considered by the trial court on the issue whether the parties intended to be married. Similarly, the court was authorized to draw an inference of public recognition of the marriage relationship from the wife's seeking and receiving support under the Protection from Abuse Act. The trial court was not required, however, to conclude, from either type of evidence that a common-law marriage existed.
 " 'Courts of this state closely scrutinize claims of common law marriage and require clear and convincing proof thereof.' Baker v. Townsend, 484 So.2d 1097, 1098 (Ala.Civ.App. 1986), citing Walton v. Walton, 409 So.2d 858
(Ala.Civ.App. 1982). A trial judge's findings of facts based on ore tenus evidence are presumed correct, and a judgment based on those findings will not be reversed unless they are found to be plainly and palpably wrong. Copeland v. Richardson, 551 So.2d 353, 354 (Ala. 1989). The trial court's judgment must be viewed in light of all the evidence and all logical inferences therefrom, and it 'will be affirmed if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.' Adams v. Boan, 559 So.2d 1084, 1086
(Ala. 1990) (citation omitted)."
Lofton v. Estate of Weaver, 611 So.2d 335, 336 (Ala. 1992)
The judgment of the trial court is affirmed.
AFFIRMED. *Page 198 
ROBERTSON, P.J., and MONROE, J., concur.
YATES and THOMPSON, JJ., dissent.