This appeal, which was transferred to this court by the Alabama Supreme Court, pursuant to § 12-2-7(6), Ala. Code 1975 arises out of an estate administration. The probate court determined that Janice M. Bush was the common-law wife of the decedent, Ronald A. Gray, who had died intestate. The probate court issued to Bush, based upon its finding that she was the decedent's common-law wife, letters of administration regarding his estate. The decedent's two sons, Raoul A. Gray and Ronald M. Gray (hereinafter "the sons") moved to set aside or vacate the probate court's judgment or for a new trial, based in part on a claim of newly discovered evidence. The probate court denied all motions. We conclude that the probate court erred in determining that a common-law marriage existed; thus, it erred in denying the motions to set aside or vacate its judgment. We reverse and remand.
The sons appealed, raising what they present as four issues. We recognize that all four of those issues are really the same issue: Whether the probate court erred in finding that the decedent and Bush had entered into a common-law marriage. We will consider the issue to be whether the probate court, having found that a common-law marriage existed (and having issued letters of administration based on that finding), erred in denying the sons' motions to set aside its previous judgment or to order a new trial.
This court stated in Barrett v. Davis, 705 So.2d 462, 464-65
(Ala.Civ.App. 1997), that a motion to "set aside" a judgment is essentially a motion to vacate the judgment, pursuant to Rule 59(e), Ala.R.Civ.P. We further stated in that case that the decision whether to grant or to deny a Rule 59 motion rests largely in the discretion of the trial court. However, that decision is subject to appellate review, and the trial court's action may be reversed where a legal right was abused and the record plainly and palpably shows the trial court is in error.Barrett, supra, quoting Coker v. Farmers Mutual Exchange, 425 So.2d 489, *Page 194 
490 (Ala.Civ.App. 1983). Furthermore, the grant or denial of a motion for a new trial based upon the movant's claim of newly discovered evidence is a matter resting largely in the discretion of the trial court, and that determination carries a presumption of correctness. This court will not reverse the trial court's ruling on that motion unless the great weight of the evidence plainly and palpably shows that the trial court erred.Owen v. Owen, 724 So.2d 6, 9 (Ala.Civ.App. 1998), citing Adkins v. GoldKist, Inc., 531 So.2d 890 (Ala.Civ.App. 1987).
This Court stated in Stringer v. Stringer, 689 So.2d 194 (Ala.Civ.App. 1997):
 "`Courts of this state closely scrutinize claims of common law marriage and require clear and convincing proof thereof.' Baker v. Townsend, 484 So.2d 1097, 1098 (Ala.Civ.App. 1986), citing Walton v. Walton, 409 So.2d 858 (Ala.Civ.App. 1982). A trial judge's findings of facts based on ore tenus evidence are presumed correct, and a judgment based on those findings will not be reversed unless they are found to be plainly and palpably wrong. Copeland v. Richardson, 551 So.2d 353, 354 (Ala. 1989). The trial court's judgment must be viewed in light of all the evidence and all logical inferences therefrom, and it "will be affirmed if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment." Adams v. Boan, 559 So.2d 1084, 1086 (Ala. 1990) (citation omitted).'
 "Lofton v. Estate of Weaver, 611 So.2d 335, 336 (Ala. 1992)."
Stringer, 689 So.2d at 197 (citation omitted.)
In Alabama, recognition of a common-law marriage requires proof of the following elements: (1) capacity; (2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and, (3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation.Stringer, 689 So.2d at 195, quoting Crosson v. Crosson, 668 So.2d 868,870 (Ala.Civ.App. 1995), citing Boswell v. Boswell, 497 So.2d 479, 480
(Ala. 1986). Whether the essential elements of a common-law marriage exist is a question of fact. Stringer, supra, citing Johnson v. Johnson,270 Ala. 587, 120 So.2d 739 (1960), and Arrow Trucking Lines v.Robinson, 507 So.2d 1332 (Ala.Civ.App. 1987). Whether the parties had the intent, or the mutual assent, to enter the marriage relationship is also a question of fact. See Mickle v. State, 21 So. 66 (1896).
Janice Bush, who claimed to have been the decedent's common-law wife, testified before the probate court that she met the decedent in 1987. She stated that in 1990 they made an agreement to be husband and wife and that she, pursuant to that agreement, converted from her Baptist to his Catholic faith. However, Bush admitted that she was not divorced from her previous husband until 1991. She also stated that the decedent helped her procure her divorce from her previous husband and that the decedent chose her attorney for that divorce action. Bush said that during her relationship with the decedent, which continued until his death in 1999, he did not date anyone else and, as far as she knew, he did not have an affair outside their relationship.
Bush testified that she and the decedent attended social occasions together. Although at those functions he did not introduce her to others as "his wife," he did introduce her to others as "his better half" or as his "boss lady," and she stated that everyone knew she and the decedent were living together. However, she never took the decedent's last name as her own, and *Page 195 
she stated that everyone in the community knew her by the name "Janice Bush." Bush admitted that she never referred to herself as, or considered herself to be the decedent's wife, because, she explained, everyone knew "what [she] was to him." She testified that she and the decedent never exchanged wedding bands; in response to the question whether they ever went on a honeymoon, Bush responded, "Why would we go on a honeymoon when we didn't get married?" However, she clarified that by her saying they had made plans to marry, but that the decedent's mother had interfered with the plans to the extent that she and the decedent canceled them. She also said she and the decedent took other trips together.
Although Bush stated that she and the decedent lived together during different periods (roughly from 1987 to 1994) over the course of their relationship, she admitted that she maintained her own residence for the last few years of their relationship. Bush also testified that the decedent maintained his own separate residence and that both she and the decedent maintained their residences under their own names. She explained that the decedent purchased his own residence because he wanted his sons to inherit something of value. She further explained that she and the decedent did not constantly live together because in her employment she worked "swing shifts." Bush testified that she performed household duties and cooked for the decedent and that she cared for him when he was sick. She was not monetarily compensated for her household duties. Bush stated that the decedent required that she, because she had her own job and earned her own money, pay her own car payments and insurance and dress nicely.
Bush never filed a joint income-tax return with the decedent and never held a joint bank account with him. She testified that the decedent always filled out her tax forms, and that those forms indicated her marital status as single. Her driver's license and Social Security card indicate that she never took the decedent's last name as her own. All of Bush's credit cards are listed in her own name. She also financed purchases of furniture and vehicles in her name only. Bush informed her employer of 26 years that she was single. The only piece of evidence Bush offered to show that she and the decedent either owned or applied for anything jointly was an application for life insurance bearing signatures purporting to be those of Bush and the decedent; however, both of the decedent's sons testified that the signature purporting to be the decedent's appeared to have been forged.
Laverne Pernell, a friend of the decedent's, testified that she knew Bush and that she had thought of Bush and the decedent as having a husband/wife relationship. She stated that in her company the decedent referred to Bush as his "better half," but that he never referred to her as his wife. Pernell testified that she knew that the decedent maintained a relationship with another girlfriend, Bessie Hinds, during the course of his relationship with Bush. Barbara Gates, a friend of Bush's, testified that Bush and the decedent lived together "like husband and wife," in the same residence. Gates stated that although the decedent referred to Bush as his "better half," he never referred to her as his wife. Joyce Dawkins testified that she knew the decedent and Bush had lived together for about eight years. She also stated that the decedent referred to Bush only as his "better half."
Raoul Gray, one of the decedent's sons, testified that the decedent referred to Bush only as his girlfriend, not as his wife. He also stated that the decedent told him he never intended to marry more than one *Page 196 
time (and the decedent had already been married and divorced once before he met Bush). He said he never heard the decedent or Bush refer to themselves as husband or wife. However, Raoul testified that the decedent and Bush lived together for several years. Raoul also testified that the decedent filed tax returns indicating his marital status as single and that he received bills from creditors solely in his name. Raoul explained that he knew Bush was not listed as a debtor on any of the decedent's accounts, because he, i.e., Raoul, had paid the decedent's bills from early 1999 until the decedent's death in October 1999. Raoul said the only item of property that he knew the decedent and Bush owned jointly was a television, for which he said the decedent was making the payments on behalf of Bush to a finance company.
Ronald Gray, the decedent's other son, testified that the decedent never indicated to him an intention to marry Bush. He said he never heard the decedent or Bush refer to the other as husband or wife. Ronald stated that the decedent and Bush had lived together, although it was not in a constant manner. He also stated that the decedent and Bush never had children together. Ronald also testified that during the course of the decedent's relationship with Bush he had two other girlfriends.
Margaret Gray, the decedent's former wife and Raoul and Ronald's mother, testified that she and the decedent were married for 13 years before the decedent began his relationship with Bush. She stated that she never heard the decedent and Bush refer to themselves as husband and wife and never heard the decedent express an intention to marry Bush. She testified that she knew the decedent and Bush had lived together for a short time while the decedent was trying to pay off some of Bush's debt. She said that when she asked the decedent whether he intended to marry Bush, he specifically replied, "Like a snowball in hell." She testified that she knew that the decedent was maintaining relationships with other girlfriends during the course of his relationship with Bush. Vance Gray, the decedent's father, testified that he never heard the decedent and Bush refer to themselves as husband and wife and never heard the decedent refer to Bush as his "better half." He also stated that within the last two or three years of the decedent's relationship with Bush, the decedent also dated one other girlfriend. He also testified that he did not know the decedent and Bush had ever lived together.
Josephine Gray, the decedent's mother, testified that although she and the decedent talked about his relationship with Bush, he never told her that he considered himself to be married to Bush or that he ever intended to marry her. She said she never heard the decedent and Bush refer to each other as husband and wife. However, she testified that she knew the decedent and Bush had lived together for a few months on one occasion, but she said the decedent had explained that it was just a temporary situation. She also stated that she knew the decedent maintained a relationship with at least one other girlfriend during the course of his relationship with Bush.
Bessie Hinds testified that she and the decedent had a 20-year sexual relationship "until the day he died, really." Hinds stated that the decedent never discussed with her his relationship with Bush except to say that they were friends. She said she never heard the decedent or Bush refer to the other as husband or wife, although she knew the decedent and Bush lived together for a while. She also testified that the decedent rented his own residence. Hinds stated that she knew the *Page 197 
decedent was seeing another person during the course of his relationship with Bush.
Our review of the record indicates that Bush did not present clear and convincing evidence indicating she was the decedent's common-law wife. See Stringer, supra, quoting Lofton, supra, quoting Baker, supra, citingWalton, supra. Although the evidence shows that the decedent and Bush had the capacity to marry each other after 1991, when Bush divorced her previous husband, Bush failed to produce substantial evidence indicating a present, mutual agreement to permanently enter a marriage relationship to the exclusion of all others. Bush testified that she and the decedent had at one time planned to marry and that she had converted to his religion in reliance on that plan; however, she also testified that they never went through with those plans, because of his mother's interference. Bush presented no further evidence indicating that they ever tried or intended to marry. However, the decedent's former wife and sons testified that the decedent never informed them of an intention to marry Bush; in fact, the evidence indicates that decedent affirmatively denied such an intention when confronted by his former wife. Furthermore, several witnesses testified that the decedent maintained relationships with other women at the time he also maintained one with Bush. See Stringer, supra, quotingCrosson, supra, citing Boswell, supra; see also Stringer, supra, citingMickle, supra. Furthermore, Bush presented no substantial evidence indicating a public recognition of their relationship as a marriage and indicating a public assumption of marital duties and cohabitation. Although several witnesses testified that the decedent referred to Bush as his "better half," and Bush stated that everyone in the community knew she and the decedent were together in a relationship, no one testified that they referred to themselves as, or considered themselves to be, husband and wife. See Stringer, supra, quoting Crosson, supra, citingBoswell, supra. Although we presume that a trial court's decision based on ore tenus evidence is correct, the paucity of facts to support Bush's claim of a common-law marriage compels us to hold that the judgment of the probate court is plainly and palpably wrong. See Stringer, supra, quoting Lofton, supra, citing Copeland, supra. Therefore, the trial court's order — based on a finding that Bush was the decedent's common-law wife — denying the sons' motions to set aside or vacate its judgment or for a new trial constituted an abuse of its discretion. That order is reversed. See Barrett, supra, quoting Coker, supra; see also Owen, supra, citing Adkins, supra.
REVERSED AND REMANDED.
Yates, P.J., and Crawley and Thompson, JJ., concur.
Murdock, J., concurs in the result.