7 So.2d 485

**GILBREATH et al. v. LEWIS et al.**

**8 Div. 130.**

Supreme Court of Alabama.

April 9, 1942.

Scruggs & Creel, of Guntersville, for appellees.

Marion F. Lusk, of Guntersville, for appellants.

GARDNER, Chief Justice.

Complainants file this bill seeking a sale of certain described real estate for division among the tenants in common. This real estate originally belonged to Emmett Gilbreath, and among his heirs was Grover Gilbreath who died in April, 1928. There was no pretense of a ceremonial marriage, but complainants claim to be the legitimate children of Grover Gilbreath through a common law marriage of said Grover with their mother, a party defendant to the bill under the name of Decie King. The two girls are married, the oldest child being now Ophelia Stone, and the youngest Margie Lewis. The boy John is over twenty-five years of age.

Upon consideration of the proof, taken by way of examination of the witnesses before the register (Equity Rule 56, 238 Ala. XXXIV), the chancellor decreed complainants relief, and from such decree the appeal is prosecuted.

The decree is preceded by a brief statement by the chancellor disclosing his opinion that when these three children were born no common law marriage existed between Grover Gilbreath and Decie King, but that Grover was in fact the father. We are in accord with this conclusion. The chancellor, however, concluded a common law marriage, with recognition of the children by Grover (Title 27, § 10, Code 1940), was established by the proof of the relationship between Grover and Decie King after Grover's return from California, as hereinafter appears, and rested his decree upon that basis. But we find ourselves unable to agree.

All parties resided in Guntersville, Alabama, and Grover's original home was in the two-story white house in Guntersville where his two brothers, Burton and Grady, lived.

It appears, however, that after the birth of these three children, Grover, a dissipated young man and given to much intoxication, was called into the Army, probably 1918, with exact date left to conjecture, but was rejected, and was gone four or five years thereafter, absent in California. But before leaving, and in August, 1917, he executed a deed to much real estate wherein he was designated "an unmarried man". During this period of absence there was no communication between Grover and Decie and no recognition on Grover's part as to any responsibility for the support of these children. It should be added, however reluctantly on our part, that the evidence is clear that Decie's reputation for morality was bad, and indeed the testimony of several witnesses that she was generally regarded as a prostitute appears undisputed.

As previously observed there had been no pretense of ceremonial marriage. There is some hearsay testimony concerning some effort on Decie's part for a marriage license but in that same connection the tendency of the proof was to show intoxicated condition of Grover at the time, and his arrest. We can find no direct proof that his relatives in fact intervened and prevented any marriage. All of this must be left largely to surmise.

But this was many years ago (about 1917) and evidently only a short time before he left for California. During his absence and in 1919 Decie married one Ferd Grizzle. She states they were married at 11 o'clock in the morning and separated that night, and in a few weeks a divorce was granted her husband based upon the ground of adultery. There is indication in the record the husband's father interposed objection. But that is not here important. This divorce decree was in August, 1919. And in October, 1919, under license duly issued, the said Grizzle and Decie were again married by the Judge of Probate of Marshall County. Decie says she does not know how long she lived with Grizzle following this second marriage, but that she did secure a divorce. Whether that divorce was secured before or after Grover's return about 1922 the record is silent. In any event she states she began living with Grover upon his return and so continued until his death in 1928. Grover was, at the time of his death, thirty-eight years of age.

These three children attended school in Guntersville under the name of Grizzle and when the school census was taken Decie gave them each the name of Grizzle. And so they continued. John, a short time preceding the institution of this suit, changed his name to Gilbreath. Aside from this one change, each went through the years by the name of Grizzle.

Decie makes no claim of any agreement of marriage or that Grover made any such

representation or promise. Nor did she, so far as this record shows, make any mention of a marriage relation. Nor does anyone in the entire community state that she was ever introduced as the wife of Grover or he as her husband, or that either stated to any person recognizing such relationship. The nearest approach is from the testimony of Morgan, a close friend of Grover's who at one point stated Grover referred to Decie as his wife, but in the same direct examination, in answer to the question whether or not Grover ever told him Decie was his wife, said: "Not directly that way".

Complainants appear to lay great stress upon the testimony of witnesses who state a general reputation that Grover and Decie "lived together as husband and wife". But when closely examined we think it clear these witnesses merely meant to say he stayed at her house most of the time, both night and day, as customary in marital relation. None ever heard either spoken of in the marriage relation. Illustrative is the testimony of Bud Hooper, another special friend of Grover's, who had so testified in a general way, but who afterwards stated he "would not say about the man and wife. She was there and he was there".

■ As observed in 35 Am.Jur. 331, "the term cohabitation * * * is not always employed in a matrimonial sense, instead of the fixed and comprehensive 'habit' by which the Scotch law characterizes matrimonial cohabitation."

The following quotation from Bishop on Marriage and Divorce, to be found in Topper v. Perry, 197 Mo. 531, 95 S.W. 203, 207, 114 Am.St.Rep. 777, is illustrative: "Cohabitation and reputation are at best only presumptive proofs, and when one of these foundations is withdrawn, what remains is too weak to build a presumption on. There is good sense in the Scotch law, by which cohabitation alone is considered insufficient, and which requires in addition habit and repute, because it is said the parties may eat, live, and sleep together as mistress and keeper without any intention of entering into marriage".

It is clear enough, after his return from California, Grover spent most of his time at the house where Decie and her children lived, and we think it may be said he paid the bills and she would often go with him to the farm. Some of the witnesses show clearly that so far as they could see his "home place" was the Gilbreath house where his two brothers lived. He would go there and occasionally take meals and a bath and one of his brothers would often bring his lunch to him on the farm. Decie states he took meals at her house "part of the time" and when not there "at his brother Burton and Grady's".

■ He died at the Gilbreath home, though he had only recently been carried there from Decie's house. In White v. Hill, 176 Ala. 480, 58 So. 444, 447, appears the following definition of a common law marriage: "To constitute a marriage good and valid at common law—that is, in the absence of a statute otherwise specifically providing —it is not necessary that it should be solemnized in any particular form or with any particular rite or ceremony. All that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations."

■ "If intercourse between persons of opposite sex was illicit in its inception because of their failure to enter into a marriage by ceremony or by agreement, it is presumed to continue so, and the burden of proving a subsequent intermarriage rests on the party asserting it." 38 C.J. 1328. To like effect is 35 Amer.Jur. 334.

We recognized this principle in Prince v. Edwards, 175 Ala. 532, 57 So. 714, where the Court said: "The general principle is thus stated: 'While all reasonable presumptions are in favor of marriage, yet they are overcome by proof that the relations were in their origin illicit and unlawful. The illicit relation is presumed to continue until there is proof that the parties were married. This presumption, whether of fact or of law, may be overcome by satisfactory proof of cohabitation, acknowledgment, and reputation.'"

■ Of course a valid common law marriage must rest upon mutual consent of the parties, a mutual agreement to be husband and wife, followed by cohabitation and living together as husband and wife. Tartt et al. v. Negus, 127 Ala. 301, 28 So. 713; Moore v. Heineke, 119 Ala. 627, 24 So. 374.

■■ Upon Grover's return from California, he spent most of his time at the house

occupied by Decie and the three children. He recognized the children as his own. But they were born of an unlawful union, and must rest their case upon recognition after a valid common law marriage. "When the evidence, by which filiation is established, also proves illegitimacy the presumption of legitimacy does not arise." Weatherford v. Weatherford, et al., 20 Ala. 548 (3rd headnote), 56 Am.Dec. 206.

■ The relation between Grover and Decie was meretricious in the beginning and under the authorities there rested upon the complainants the burden to establish by satisfactory proof a change in such relationship. To meet this burden there must be more than mere proof of living together, for as observed in Topper v. Perry, supra, "parties may eat, live, and sleep together as mistress and keeper without any intention of entering into marriage".

■ "When the relation between a man and a woman living together is illicit in its commencement, it is presumed to so continue until a changed relation is proved". Appeal of Reading Fire Ins. & Trust Company, 113 Pa. 204, 6 A. 60, 62, 57 Am.Rep. 448. See, also, Klipfel's Estate v. Klipfel, 41 Colo. 40, 92 P. 26, 124 Am.St.Rep. 96. And in treating the matter of cohabitation as tending to establish a common law marriage the Nevada Court in Parker v. De Bernardi, 40 Nev. 361, 164 P. 645, was of the opinion that bad moral character of either party, in that case particularly the woman, should be given due weight. Here the woman, Decie King, had established such a reputation.

She was never known as Decie Gilbreath, and after her two marriages to Grizzle gave the children the Grizzle name which they retained throughout the years. She was known by many in Guntersville merely as "Decie", and is here defending as a party defendant as "Decie King". There is no proof she was reputed in the community to be the wife of Grover. At the time of his death he and she had passed their majority many years and we can see, from this record, no occasion for failing to have a marriage ceremony if so desired, or some recognition of such relationship. Such a matter of marriage appears never to have been the subject of conversation between them.

He was a dissipated young man and she evidently lacking in moral scruples. They were content to thus let matters stand. It was stressed in the proof that after Grover's death his two brothers made contributions for the support of Decie and her children and this continued for several years. These payments began at $30 per month and reduced, first to $25 when one of the girls married and to $20 per month upon the marriage of the other.

When the brothers left for California they left two or three checks of $20 per month, and soon after these were exhausted this suit was instituted. At that time Grover had been dead nine years and Decie had made no claim to any interest in any of his property, nor made any assertion she had been his wife.

The indications are these brothers were also convinced that these children were those of Grover's and there is evidence tending to show at least some fondness for the boy John. Perhaps Grover had requested they make contributions, for Grover himself was shown to be interested in their welfare. But, however this may be, it is clear these payments were mere gratuities on the brothers' part. There is not sufficient proof here that Grover ever contemplated marriage or that the matter was ever discussed between them or that Decie so considered their relationship. On the contrary, her conduct indicates otherwise. Even her mother, testifying in her behalf, did not say she referred to Grover as her husband but as "her man". And Grover, it seems, generally called her "Decie".

■ There was no acknowledgment by either to the public of any relationship of husband and wife and we find no such recognition by the public. Upon this feature of the case the following excerpt from the opinion of the United States Supreme Court in Maryland v. Baldwin, 112 U.S. 490, 5 S. Ct. 278, 280, 28 L.Ed. 822, is here pertinent: "But where no such ceremonies are required, and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence. The protection of the parties and their children, and considerations of public policy, require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them while living together, such as deeds, wills, and other formal instruments. From such recognition the reputation of being married will obtain among friends, associates, and acquaintances, which is of itself evidence

of a persuasive character. Without it, the existence of the marriage will always be a matter of uncertainty".

But we forego further discussion. The relationship between Grover and Decie King was meretricious in its inception and we are persuaded the proof is insufficient to establish a change in such relationship. The legitimacy of these complainants must rest upon the establishment of a valid common law marriage between Grover and Decie King. But we have reached the conclusion, somewhat reluctantly we must admit, that such a marriage has not been shown and that the decree must be reversed. We say we so conclude reluctantly because we think it clear enough these complainants all along were recognized by Grover as his children, and this case very naturally presents a sympathetic appeal, for they are innocent victims of an unlawful relationship. So far as the matter of feeling goes it would be taking the road of least resistance to give these complainants a clear title to legitimacy. But as we view the proof and weigh it in the light of well recognized legal principles, we feel constrained to a contrary conclusion.

We are, therefore, of the opinion the decree was laid in error. It will be reversed and one here entered denying relief and dismissing the bill.

Reversed and Rendered.

THOMAS, BROWN, and FOSTER, JJ., concur.