This appeal arises from a challenge by Clarence Skipworth, brother of W.C. Skipworth, to the appointment of Mary Burke Skipworth as administratrix of the estate of W.C. (Bill) Skipworth. The trial court, after hearing the evidence ore tenus, found that Mary Burke Skipworth was the common-law wife of Bill Skipworth, and therefore may be appointed. We affirm.
Extensive testimony was presented to the trial court, and though some of it was in conflict, the following information can be gleaned from the record. Mary Burke and Bill Skipworth were originally married in 1960 when they were both in their fifties. This was Mary's fifth marriage (she had divorced and remarried one husband) and Bill's second marriage. In 1965 Mary secured a divorce from Bill after a fourteen months separation, although there was testimony at trial that the separation was neither continuous nor complete. Shortly after Bill signed the divorce papers the couple "forgave each other" and according to Mary's testimony resumed marital relations. This status continued until Bill's death in October, 1976, with only occasional, and brief interruptions, when Bill was drinking "booze."
Throughout their formal marriage, and their purported common-law marriage, Mary and Bill maintained several residences, all acquired by them individually prior to the formal marriage in 1960. These residences included a farm owned by Mary, a flower shop and adjacent house on Moulton Street in Decatur, also owned by Mary, and a combination house and store on Sixth Avenue owned by Bill. From 1963 on Mary operated the flower Shop on Moulton Street under the name of "Mary Burke Florist," a business name which had originally been established in the early 1950's. Because of her business, many people always referred to her simply as "Mary Burke." Bill operated several enterprises during this time, including his own flower shop at his place on Sixth Avenue and a pool room on Moulton Street. It is apparent that from the time of their formal marriage in 1960 until Bill's death both Mary and Bill conducted their business affairs as if they were both single. They kept separate bank accounts, both claimed homestead exemptions, and they filed separate income tax forms as single individuals. On the other hand, testimony indicated that they lived together, for the most part in Mary's house on Moulton Street, although Bill would occasionally stay at his house on Sixth Avenue when he was drinking or it was convenient to his work. In later years the house on Sixth Avenue apparently became more of a kennel, unfit for human habitation.
Following their divorce, Mary and Bill continued to represent themselves to the general public, their neighbors, their doctor, and hospitals as husband and wife, although when questioned, they explained the situation. Several witnesses described them as inseparable. During this time they purchased a double grave and headstone and Bill purchased several insurance policies with Mary as beneficiary. About the only ones who did not consider the couple married were members of Bill's family.
It is clear that Mary and Bill were aware that there were legal problems inherent in their status. They executed several legal documents, deeds and tax forms, as single individuals, although the evidence also showed they had filed their taxes this way prior to the divorce. Insurance, on the other hand, was purchased as husband and wife. Because of their uncertain legal status, Mary and Bill planned to undergo a second formal marriage in December of 1976, an event which was foreclosed by Bill's demise in October.
The requirements in this state for a valid common-law marriage have been outlined numerous times by this court. No ceremony and no particular words are necessary. Instead, there must first have been a present agreement, that is, a mutual understanding to enter at that time into the marriage relationship, permanent and exclusive of all others. This agreement must *Page 977 
be followed by public recognition of the existence of the "marriage" and cohabitation or mutual assumption openly of marital duties and obligations. See Beck v. Beck, 286 Ala. 692,697-98, 246 So.2d 420, 425-26 (1971) and cases cited therein.
On appeal counsel for the appellant argues that the trial court misapplied the law concerning present agreement to marry. In many instances present agreement is simply inferred from cohabitation and public recognition. Sloss-Sheffield Steel Iron Co. v. Watford, 245 Ala. 425, 428, 17 So.2d 166, 168
(1944). But, appellant asserts that here the couple's plans to undergo a ceremonial marriage in December of 1976 show a lack of present agreement. We disagree. A situation similar to that of the Skipworth's was presented in Huffmaster v. Huffmaster,279 Ala. 594, 188 So.2d 552 (1966), where the couple resumed their marriage a short while after a divorce. Testimony in that case showed that the husband and wife had intended to undergo a second ceremonial marriage but "never got time." This court stated, "A subsequent asserting `we knew we were not married' by a party . . . will hardly vitiate a valid marriage where the original understanding was to presently enter into the marriage relationship, followed by a public recognition of the relationship." 279 Ala. at 595, 188 So.2d at 554. As is apparent from this passage, the operative time is when the agreement is initially entered into, and once other conditions of public recognition and cohabitation are met the only ways to terminate a common-law marriage are by death or divorce. A party cannot legally terminate the marriage by simply changing his or her mind and moving out or by telling selected individuals, "We're not really married."
This court has further noted that a lawful common-law marriage is formed in this state "without regard to what the parties consider the legal effect of such relation to be."Smith v. Smith, 247 Ala. 213, 217, 23 So.2d 605, 609 (1945);White v. White, 225 Ala. 155, 157, 142 So. 524, 525 (1932). Common-law marriage is not limited to situations where the parties are so ignorant that they do not know that a formal ceremony is the preferred method of marrying. On the contrary, in modern society many individuals realize that common-law marriages have inherent legal problems not found in ceremonial marriages. Such a realization may prompt expressions of concern over the parties' legal status as well as attempts to eliminate any problems by undergoing a ceremonial marriage. But any evidence of this sort must be examined by the fact-finder in the context of the entire relationship, as was done by the trial court in this case.
Where the evidence is taken by the trial court ore tenus it is well established that the trial court's findings will not be disturbed on appeal unless plainly and palpably wrong. King v.King, 269 Ala. 468, 471, 114 So.2d 145, 148 (1959). Here there was ample evidence of present agreement, cohabitation, and public recognition to show the existence of a common-law marriage between Mary Burke Skipworth and Bill Skipworth after their divorce in 1965.
AFFIRMED.
TORBERT, C.J., and BLOODWORTH, ALMON and EMBRY, JJ., concur.