Appellant, Robert S. Gilchrist, was convicted of murder and sentenced to life in prison. Two issues raised on appeal will be addressed by this court.
Gilchrist first contends that any statements made by him to Derenda Henderson-Gilchrist should not have been admitted because she is his wife by common law marriage. Gilchrist produced substantial demonstrative evidence which factually supported the existence of a common law marriage. This evidence included insurance policies, applications for leases, leases, and medical records in which Derenda either signed her name as "Gilchrist" or indicated to the maker of the document that her name was Gilchrist. Along with these business records was the testimony of the custodians of each record, some of which indicated that Derenda orally represented herself to be Mrs. Gilchrist. Derenda testified that she wore a wedding band and that she knew wearing a wedding band signified to the world that she was married. Also, there was uncontradicted evidence that she allowed herself to be introduced as Mrs. Gilchrist on more than one occasion. Finally, Gilchrist and Derenda cohabitated for a period of approximately three years.
In this case, unlike most civil cases that deal with the issue, both parties are still alive, and we have a situation in which Derenda is denying that a common law marriage existed. The issue, then, is whether there had been mutual intent to form a common law marriage. Most of the evidence disputing the existence of the marriage was the testimony of Derenda who, as the testimony strongly indicates, had had a falling out with Gilchrist by this time. Unfortunately, most of Derenda's testimony was so ambiguous as to be meaningless. Her testimony reads in part as follows:
DIRECT EXAMINATION OF DERENDA HENDERSON-GILCHRIST:
 "Q. By signing that lease with the name Derenda Gilchrist were you trying to tell anybody or represent to anybody that you were married?
"A. No, we were just putting it in both of our names.
". . .
 "Q. Now, are you familiar with the Family Medical Clinic?
"A. Yes.
"Q. Are you a patient there?
"A. Yes.
"Q. What name is your record under?
"A. It's in Henderson now, it was Gilchrist.
". . .
 "Q. Would you explain . . . how it got into . . . Gilchrist and how it got back into Henderson?
". . .
 "A. Steve had seen him [Dr. Spafford] over there and already had a file and I just used Steve's file when I started seeing him over there.
". . .
 "Q. All right, were you trying to represent to anybody over there that you were married to him?
 "A. In his files he had down he was single and when I called and told them that I was Derenda Gilchrist and that my husband had a file there she just put me in with his. [Emphasis ours.]
". . .
 "Q. Have you ever told anyone else that you were married or represented to anyone that you were married to the defendant, Steve Gilchrist?
 "A. Nothing other than the things that were in both our names. *Page 990 
"Q. And that was for a matter of convenience?
"A. Yes.
". . .
 "Q. Derenda, did there come a time . . . when you and the defendant reached an understanding that you were gonna live together as man and wife and forsake all others and you would represent yourself to your friends and your acquaintances that you were married?
"A. Not like that, no.
"Q. All right. What do you mean not like that?
 "A. We were living together and I'd cook and clean and he went to work and we'd take care of each other, but as far as being single and all, yes, I considered myself as being common law with Steve but Steve considered it when he wanted it to be.
". . .
 "Q. All right. . . . [D]id . . . you consider that there was such an agreement between you . . . as if you were in fact husband and wife?
"A. Not like . . . husband and wife as being married.
". . .
 "Q. What did you mean when you said `I considered it a common law marriage?'
 "A. We were living together and I was taking care of him. I mean, I didn't date anybody else and we were working and we were sharing expenses and things.
"Q. So you acted as if it were a marriage?
"A. Yes.
". . .
 "THE COURT: If you thought you were already married why would you want to go through with the ceremony?
 "A. We weren't like legally married. We were just more or less, you know, common law. Steve, you know, to get married we were gonna make it . . . that would a ceremony only it would be legal."
If the judge had made his finding that no mutual intent to form a marriage existed based on the above quoted collection, self contradictory and sometimes meaningless phrases, this court would have been tempted to reverse in light of the strong demonstrative evidence to the contrary. However, there were two other things for the judge to consider. First, the couple had contemplated a formal ceremony on at least two different occasions. At one time, they went so far as to obtain blood tests. Although plans to undergo a ceremonial marriage will not automatically show a lack of present agreement to enter into common law marriage, Skipworth v. Skipworth, 360 So.2d 975
(Ala. 1978), when the necessary intent has never been established and the issue is as unclear as here, plans to undergo a ceremony cannot be overlooked as a factor tending to illuminate the issue.
Secondly, Gilchrist, on cross examination, testified as follows:
"Q. Did you discuss a formal ceremony?
"A. We have discussed a formal ceremony.
". . .
"Q. What was the result of that discussion?
 "A. I'd just come out of a divorce and we decided it best not right then.
 "Q. You didn't want to get back into another marriage?
"A. Not just yet; yes, sir, that's correct.
"Q. You just wanted to live with her a while?
"A. Yes, sir.
"Q. See if you could get along?
"A. Yes, sir."
Alabama does not recognize trial marriages. Turner v. Turner,251 Ala. 295, 37 So.2d 186 (1948). The necessary element of intent is a present intention to enter into a common law marriage, not an intention to marry in the future. Piel v.Brown, 361 So.2d 90 (Ala. 1978). *Page 991 
Taken together, the facts that the couple contemplated a formal ceremony and that Gilchrist did not want to enter into a formal marriage are sufficient facts on which the judge could base his ruling.
Gilchrist next contends that the State did not prove the corpus delicti. This contention is based on the fact that the body of the victim was never found and the contention that a murder conviction cannot be based solely on an extrajudicial admission. Hill v. State, 207 Ala. 444, 93 So. 460 (1922).
In the case sub judice, the statements made by Gilchrist to Derenda Henderson, which we have decided were admissible, indicated that he struck the victim several times in the head with a large stick and then hid her body. Additionally, evidence was introduced that the offense had been committed. These facts included: (1) that Christina Zane, the victim, had been missing for almost five months, contrary to her habit of contacting her parents regularly; (2) that Zane's friends and neighbors had not seen her since the day she disappeared; (3) that Zane had not shown up at work since the day she disappeared, although she usually did show up or call when she could not work; (4) her small dog was found inside her abandoned car, although she was in the habit of keeping the dog with her at all times; (5) Zane had little money and "lived from paycheck to paycheck;" yet, she had not picked up her last paycheck, something she was likely to do absent foul play; (6) Zane was not unhappy and had not told anyone that she was going to leave town; and (7) her purse and driver's license were found in her abandoned car.
In the case of Hill v. State, supra, the supreme court said:
 "[I]nconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confessions of the accused so as to satisfy the jury beyond a reasonable doubt, and so support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti."
For the foregoing reasons, the judgment of the lower court is due to be affirmed.
AFFIRMED.
All the Judges concur.