MOORE, Judge.
Kathy Renea Howard Watkins appeals from a judgment of the Etowah Circuit Court (“the trial court”) concluding that she and Robin Dale Watkins, who is deceased, were not married at common law. We affirm.

Procedural History

On June 7, 2012, Kathy filed a complaint in the trial court, asserting, among other things, that Robin Dale Watkins- (“Rob”) died intestate on March'1, 2012; 'that Kathy and Rob had been married at common law; and that the-named defendants, Ryan Watkins, individually and as personal representative of Rob’s estate, and Savannah Jade Watkins, denied that Kathy was Rob’s widow;[1] Kathy sought a judgment declaring that she was the wife of Rob at the time of his death and that she was entitled to share in Rob’s estate. ' Ryan and Savannah are Rob’s son and daughter, respectively. The defendants answered the complaint. A trial was held on July 11, 2013, November 13, 2013, and April 2, 2014. On April 18, 2014, the trial court entered a judgment concluding that Kathy and Rob had not been married at common law. Kathy filed a postjudgment motion on May 14, 2014; that motion was denied on July'30, 2014. Kathy filed her notice of appeal to" the Alabama Supreme Court on September 2,' 2014; that court transferred the appeal td this court, pursuant to Ala. Code 1975, § 12-2-7(6).

Facts

Kathy testified that she, first met Rob in January 2008, while both she and Rob *927 were still married to, but separated from; their respective spouses; she stated that, at that time, she was living in Ashville and Rob was living in Centre. Kathy stated that Rob had obtained a divorce from his former wife on February 20,2008, and that she- had obtained a divorce from her former husband in April 2008. - According to Kathy, both parties had children from their previous marriages. According to Kathy, she and Rob first became good friends, but, she said, they had met in Orange Beach in June 2008 and had told each other they loved one another and had been together, from that point forward. She testified that Rob had asked her to marry him and that she had said yes but that he had said that they “could not go through a ceremony” because he and his former wife continued to own business enterprises together arid he was concerned that his remarriage would affect his ability to buy out the interest in those companies from his former wife, and, Kathy said, she had agreed to that arrangement. Kathy stated, however, that she and ,Rob had gone on a trip to a resort in Jamaica, on December 31, 2008, that that trip was their honeymoon, and that, during that trip, Rob had said to her that she was his wife and that he had to be submissive to her. She testified that, also during that trip, she had told people at the resort that she and Rob were husband and wife.
Kathy testified that, when she and Rob returned from Jamaica, Rob began staying with her and her children at her home in Ashville on Mondays and Wednesdays when he was nearby for work; that he stayed by himself on Tuesdays and Thursdays, closer to his work in Centre; and that, on the weekends, she and her children and Rob stayed at her and Rob’s home in Gadsden (“the white house”), which, she said, Rob had purchased and moved into after showing her the house before they went to Jamaica. According to Kathy, she and Rob had maintained the separate households in Ashville and Gadsden until April 2011, when a tornado destroyed her home in Ashville and she and her children moved into the white house with Rob. Kathy testified that Rob had been a role model for her children, that he had been “their father;” and that they had called him “their stepdad.” ■ ■ [1]
Kathy stated that Rob had given her a set of rings, an engagement ring and .a wedding ring, on July 30, 2011, after Rob’s former wife remarried. She stated that, on that occasion, he knelt down, sang her a song, and gave her the engagement ring; she stated that he gave her the wedding band the next night. She stated that he had asked her to change her relationship status on the Facebook social-networking Web site at that time, but not to marry him, because they had already been married. . The defendants presented a copy of a photograph that had been posted on Kathy’s Facebook page on July 30, 2011, which Kathy admitted was a picture of her ring, with the caption: “My marriage proposal....” Kathy denied that she. had written that caption using the word “proposal,” and she asserted that her Facebook account had been hacked and that the caption had been altered. Kathy testified that, from the time she met Rob until the time of the.trial, she had been a teacher at a school in St. Clair County. Kathy admitted that her class’s Web page listed her name as Kathy Howard, her maiden.name. She testified that she had never changed her name at the school or on. her Social Security card and that she had gone by “Kathy Howard,”.although, she stated, she had introduced herself as Kathy Watkins when she was out of town.
.According to Kathy, she and Rob had purchased airline tickets and had made reservations to return to the resort in Jamaica where they had gone in 2008 with all of'their children, Kathy’s parents, and *928 Kathy’s sister and her husband on March 25, 2012, “to renew a vow that [Rob] and [Kathy] had already made together.” Kathy testified that, after those reservations had been made, Rob had been involved in a car accident, that he had been airlifted to the University of Alabama at Birmingham hospital, and that life-support systems had been placed on him. She stated that Rob’s son, Ryan, had asked her to make the decision to remove Rob from life support because she was his wife, that she had made the decision, and that Rob had died on March 1, 2012.
According to Kathy, she and Rob had not had a joint bank account but, instead, had maintained separate checking accounts. She stated that she and Rob did not have any jointly owned real estate or credit cards and that she and Rob had filed separate tax returns, although, she said, she had filed' her 2011 tax return ás “married, separate” on January 28, 2012. She testified, however, that Rob had filed his 2011 tax return separately as a single man. Kathy admitted that she and Rob had not held anything jointly as husband and wife and that her name was not on the deed to the white house. Ryan’s attorney presented as an 'exhibit a document that Rob had completed for a doctor’s office in Gadsden, dated November 4, 2011, in which he listed “Kathy Howard” as his emergency contact and listed his marital status as “divorced.”
Luther Gartrell, an attorney in Ashville, testified that he was a friend of Rob and that he had known Kathy most of her life. Gartrell testified that, in the fall of 2008, Rob had visited Gartréll’s office and had asked Gartrell what a1 common-law marriage was and had told Gartrell that he was planning on being common-law married to Kathy. Gartrell stated that Rob had told him. in early 2009 that he and Kathy;-had gotten married in- Jamaica. According to Gartrell, he- had heard Rob tell people that he and Kathy.were married and, as far as he knew, the fact that they were married was common knowledge. Mary Ann McCullars testified that she had met Kathy and Rob on December 31, 2008, in Jamaica at a resort; that Rob had introduced Kathy as his wife; and that Rob and 'Kathy .had told McCullars and her boyfriend that they were in Jamaica on their honeymoon. Joan Roby, a janitor at the school where Kathy works, testified that she had met Rob early in his and Kathy’s relationship and that she had seen him often. Roby testified that, following the Jamaica trip, Rob had told Roby that he and Kathy were married and that Kathy was his wife. According to Roby, among other friends and in her opinion, Kathy and Rob had had a reputation of being husband and wife.
Laura Ann Carter, who teaches with Kathy, testified that She had known Rob for close to six years; that, after Rob and Kathy had returned from Jamaica, Rob had said' that Kathy was his wife and that they were married. Carter stated that she and her husband had gone to Talladega with Kathy and Rob in October 2009 and that Rob had introduced Kathy as his wife to a business associate. According to Carter, Kathy and Rob had had a reputation among their friends of being husband and wife. Paula Westbrook, Kathy’s sister, testified that she had first met Rob in 2007; that, after the trip to Jamaica, Rob had said that Kathy was his wife; and that she had heard Rob introduce Kathy as his wife on a number of occasions. Paula also testified that Rob had referred to Paula as “his sister” on different occasions. According to Paula, their friends and the community had recognized Kathy and Rob as husband and wife after they returned from Jamaica.
■ Greg Watkins, Rob’s brother, testified that he had lived in the white house for *929 approximately a year beginning in 2010 after he went through a divorce and that, after the tornado destroyed Kathy’s house, she had lived there, full time. According to Greg, Rob had told him that he and Kathy had gotten married while they were on vacation in Jamaica. He stated that, from that time forward, he had observed Kathy and Rob living together as husband and wife. Greg testified that he had attended parties at the white house and that he had heard Rob introduce Kathy as his wife. He stated that there were many people at those parties and that, among those people, Kathy and Rob had had the reputation of being husband and wife. Greg testified that, after the • trip to Jamaica, Rob had told him that they were keeping their" marriage quiet because of Rob’s former wife, although, Greg admitted, Rob’s former wife had remarried in 2010 and it had pot made sense why they had continued to ■keep their marriage a secret after her remarriage.
Sherry Brandon testified that.she had been Kathy’s friend for 23 years and that she had met Rob shortly after the two began dating. She stated that, after they returned from Jamaica, Rob had told her that they had made a commitment of marriage to each other and that Kathy had affirmed that. Sherry testified .that she had heard Rob refer to Kathy as his wife to a server while out at a restaurant. She also testified that she had considered them to be husband and wife. According to Sherry, she had been present at the end-of-summer party at Kathy and Rob’s house in 2011 when Rob had given Kathy a ring, and, she said, it had never been said before the party that it was an engagement party. "She stated that,"before the party, Rob had told her that he was "giving Kathy a ring and that they were “making it public.” Sherry testified that she had seen the photograph that Kathy had posted on Fa-cebook of her ring and that the caption had not referred to a marriage proposal. According to Sherry, Rob had had a Face-book account that was later deleted and that, before it had been deleted, Rob’s relationship- status on Facebook had been listed as “married.”'
Sherry’s fiancé, Joey Wood, also testified that Rob had told him that he and Kathy were going to get married in Jamaica and that, upon their return from Jamaica, Rob had told him that they had gotten married. " Wood testified that, after the trip, Rob had referred to Kathy as his wife and had referred to Kathy’s children as his children. He stated that Kathy’s photograph of the rings on Facebook had not referred to a marriage proposal. He admitted, "however, that Kathy and Sherry had discussed the Facebook post, that Kathy had told him her recollection" óf what she thought she had posted, and that that is "what stood out in his mind. Kristy Usiy, Sherry’s sister, testified that she had known Kathy for 25 years and that she had met Rob in 2008. She testified that she had heard Rob refer to Kathy’s youngest child as his son and to Kathy as his wife and that Kathy and Rob had appeared to be husband and wife from her observations.
Jordan Clifton, .Kathy’s son who was 18 years old at the time of the trial,- testified that, after Kathy and Rob returned from Jamaica, Rob began coming to Ashville two times a week “and . he kind of called it his home” and that they went to the white house on weekends.-, Jordan-testified that, a couple of months after they- returned from Jamaica, he began calling Rob his stepfather and that Rob had treated Jordan like he was Rob’s son. Jordan stated that Rob had introduced himself as Jordan’s father. According to Jordan, Rob had asked him whether he knew that he and Kathy had “committed to each other [as] husband and wife” in Jamaica and Jordan had said that he knew. Jordan *930 testified that they had had a “family ceremony” in August 2011 before going back to school, that Rob had planned to have both a wedding ring and an engagement ring to give to Kathy that night, but the wedding ring had kept “sliding off’ and Rob was afraid he was going to lose it, so he had placed it back in the box and had given the wedding ring to Kathy the next day. Jordan stated that Rob had told him that he had not given Kathy the rings before that time because of his former wife.
Joshua Clifton, Kathy’s son who was 22 years old at the time of the . trial, testified that, on Thanksgiving Day in 2008, Rob had asked him if it was okay if he married Kathy. Joshua stated that he had told Rob it was okay and that Rob had told him about his plans to take Kathy to Jamaica and to marry her there. According to Joshua, after Rob and Kathy returned from Jamaica, Rob had told him that he had committed himself to Kathy while they were there. He testified that Rob had béen a father to him and his brother and that Rob had attended his games at school and had been introduced in front of the entire school as his stepfather. Joshua testified that'he had'nót átténdéd the party at which Rob had given Kathy the rings, but, he said, Kathy had- been wearing both of the rings on the day he returned to the white house. •
Christina Callatine testified that’she had begun working for Rob and his former wife in November 1995, that she had worked off and on for’ them since that time, and' that she had worked directly with Rob since 2004. Callatine testified that she and Rob had had a close relationship, that they had had a lot of respect for each other, and that they had known a lot of things about each other’s personal lives. She stated that, after Rob and his former wife had divorced, Rob had said that he was never going to remarry. Callatine testified that she had helped Rob make plans for a vacation in 2012 because he and Kathy were going to return to Jamaica to get married; that she had faxed the paperwork to the resort to make the reservations; and that that paperwork had included both his and Kathy’s divorce papers. She testified that Rob had invited her to his and Kathy’s house for a party and that he had told her that he was going to propose marriage to Kathy in July 2011, but she had not attended the party. Calla-tine stated that Rob had talked to her about getting married and that he had been very adamant about getting a prenuptial agreement. She stated that he had never told her that he and. Kathy were already married. According to Callatine, Rob had told her that it would create problems if the former wife were, to learn that he was married.
Jay Machleit testified that he had known Rob for 22 years, that they had worked across the street from each other, and that they had been like brothers and had talked about everything. According to Machleit, Rob had said that he was never going to remarry following his divorce from his former wife¿ He: testified that he had attended the party in July 2011 and that the purpose of the party had been for Rob to ask Kathy to marry him. He stated that Rob had promised him that, if he got remarried,' he would have a prenuptial agreement' in place.' Machleit testified that Rob‘had asked him to go to Jamaica with him to be his best man. According to Machleit, after Rob’s accident, he had heard Kathy tell the doctor at the hospital that she was Rob’s fiancée.
Jerry Matthews testified that he had worked for Rob and his former wife for a total of approximately 16 or 17 years. He stated that he originally had worked for Bill Turner, Rob’s former wife’s father, who had started the Piggly Wiggly stores in that area, and that Turner had split the *931 stores among, his children, including Rob’s former wife. He stated that he and Rob had maintained a “pretty good” relationship after Rob and his former wife had divorced, although, he said, he had not seen Rob often.. Matthews .testified that Rob had.told him that he was dating Kathy, that they had later separated three or four months before Rob died, and that, approximately a-month later,-, .they had been back together and were getting married. According to Matthews, Rob had said that he and Kathy were going to have a prenuptial agreement and that “[wjhat’s mine is mine and what’s hers will be hers.”
Ryan, Rob’s son, testified that he and Rob had been very close and that they had talked multiple times a day and had .visited often. He stated that Rob had explained that, when he got remarried, he would have a prenuptial agreement stating that anything he had at that time would be for Ryan and Savannah and that any business interests he acquired thereafter would be shared with Kathy and split' among her and her family. According to Ryan, in 2010, Rob had said that he and Kathy were getting more serious and had been talking about the future, but, Ryan said, Rob had said he was hesitant because of his previous marriage and he wanted to take it slow and not rush into anything. Ryan testified that Rob had enjoyed being a bachelor but that Kathy had been pushing him to get married and he was not ready.
Ryan stated that, around the end of 2010,- Rob had begun' talking about getting married to Kathy and having a prenuptial agreement. According to Ryan, Rob had told him that the purpose of the party at the white house in July 2011 was for Rob to ask Kathy to marry him. He stated that Kathy had never told him before Rob’s death that she was married to Rob and that he did not recall Rob or Kathy announcing that they were-married at any of the parties he had attended at the white house.- Ryan testified that, at the party in July 2011, Rob had been nervous about ■asking Kathy to marry him and had proposed much later than he had planned. According to Ryan, after the proposal, Rob still had had some-reservations and he had told Ryan that it was going to be a long engagement. Ryan stated that he had never seen Kathy wearing a wedding band, but only an engagement ring. Ryan testified that Rob had told him that he and Kathy had wanted to return- to -Jamaica and to take everybody and have the marriage ceremony there.- He stated that Rob had told him that he was going to speak with an attorney to draft a prenuptial agreement before they all went to Jamaica. 'According to Ryan, when they were at the hospital following Rob’s accident, Kathy had informed the doctor that she was Rob’s fíancéé,' Ryan stated that, when it was time to decide Whether to keep Rob alive oh machines, he had asked Kathy for her opinion because she was going to marry Rob, but thát he had made the final decision. ' Carolyn Watkins, Rob’s stepmother, testified that she had seen Rob regularly, that he did not plan on getting remarried, and that he and Kathy were not married.' Carolyn testified that she had heard Kathy say, while at the hospital following Rob’s accident: “I wish that he’d wake up in time for us to just get married.”
. Savannah, Rob’s daughter, who was 19 years old at the time of the trial, testified that she and Rob had been very close and that he had never said anything to her about he and Kathy being married. Savannah testified that she recalled a conversation with Rob after -the 2008 Jamaica trip, but before the tornado, when he had said that he and Kathy had broken up because Kathy had said she was leaving if he did not marry her and he had refused to get married. She stated that, before Rob proposed to Kathy, Rob had told her *932 that he just wanted to keep dating and that he was not very serious about marriage, that he did not want to get married again, and that he liked being a bachelor. According to Savannah, Rob had told her that he was going to propose to Kathy at the back-to-school party that year and he had asked her to attend. Savannah testified that, before the engagement party, none of the witnesses from the tidal had said ip her presence that Rob had already married Kathy. Savannah stated that, at the party, Rob had gotten down on one knee and said: “Kathy, would you change your Facebook status to being engaged to me?” She testified that she had watered Kathy take a photograph of the ring and upload it to Facebook and that, when she had seen -the photo on Kathy’s Facebook page, the. caption had referenced the 'marriage proposal. Savannah stated that Rob and Kathy had told her that they were going to go to Jamaica to get married in March 2012 and that she and Kathy had sat down at one time to plan the trip, that they had looked at different wedding packages at the resort, and that Savannah had helped Kathy choose a package.

Discussion

Kathy argues on appeal that- the trial court-erred in concluding that she and Rob were not married at common law.' '
“In Lofton v. Estate of Weaver, 611 So.2d 335 (Ala.1992), our supreme court set forth the standard of review appropriate to this case:
“ ‘ “Courts of this state closely scrutinize claims of common law marriage and require clear and convincing proof thereof.” Baker v. Townsend, 484 So.2d 1097, 1098 (Ala.Civ.App.1986), citing Walton v. Walton, 409 So.2d 858 (Ala.Civ.App.1982). -A trial judge’s findings of 'facts based on ore tenus evidence are presumed correct, and a judgment based on those findings will not be reversed unless they are found to be plainly and palpably wrong. Copeland v. Richardson, 551 So.2d 353, 354 (Ala.1989). The trial court’s judgment must be viewed in light of all the evidence and all logical inferences therefrom, and it “will be affirmed if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.” Adams v. Boan, 559 So.2d 1084, 1086 (Ala.1990) (citation omitted).'
“611 So.2d at 336, ‘Clear and convincing evidence’ is defined as
“ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing. evidénce requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.’
“§ 6-ll-20(b)(4), Ala.Code 1975. Discussing. the. elements of a common-law marriage, this court has written:.
.. “ ‘In Alabama, recognition of a com- ■ mon-law marriage requires proof of the following elements: (1) capacity; (2) present, mutual, agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and (3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation. Stringer [v. Stringer], 689 So.2d [194,] 195 [ (Ala.Civ.App.1997) ], quoting Crosson v. Crosson, 668 So.2d 868, 870 (Ala.Civ.App.1995), citing Boswell v. Boswell, 497.So.2d 479, 480 (Ala.1986). Whether the essential elements of a common-law marriage exist is a question of fact. Stringer, supra, citing *933 Johnson v. Johnson, 270 Ala. 587, 120 So.2d 739 (1960), and Arrow Trucking Lines v. Robinson, 507 So.2d 1332 (Ala.Civ.App.1987). Whether the parties had the intent, or the mutual assent, to enter the marriage relationship is also a question of fact. See Mickle v. State, 21 So. 66 (1896).
“Gray v. Bush, 835 So.2d 192, 194 (Ala.Civ.App.2001).”
Cochran v. Chapman, 81 So.3d 344, 345-46 (Ala.Civ.App.2011).
The trial court concluded in its judgment that clear and convincing evidence did not support á finding of either á present, mutual agreement to enter the marital relationship or public recognition of the relationship as a marriage. Kathy argues that evidence submitted at the trial supports a finding that each of the elements of a common-law marriage has beén met in the present case. She asserts that clear, convincing, and uncontradicted evidence proved that she and Rob had “a completed common law marriage in January 2009.” We disagree. Kathy asserts that there was a present agreement between her and Rob to be husband and wife in 2008. Although evidence was presented at trial that could support a finding of a common-law marriage, that evidence was not in any way uncontradicted, as asserted by Kathy on appeal. Rather, as noted by the- trial court, that evidence was “hotly disputed” by witnesses for the defendants. Testimony by Rob’s family and friends indicated that Rob had not wanted to remarry, that he had proposed marriage to Kathy in July 2011, and that he and. Kathy had intended to get married in Jamaica in March 2012.
Kathy argues that the trial court erred in finding that her and Rob’s plans to participate in a marriage ceremony reaffirming their marriage in March 2012 -in Jamaica showed a lack of present agreement. Citing Gilchrist v. State, 466 So.2d 988 (Ala.Crim.App.1984), Kathy asserts that “[pjlans to undergo a later ceremonial marriage do not automatically establish a lack of present agreement to enter into a common law marriage.” ' In Gilchrist, however, the Alabama Court of Criminal Appeals stated, in pertinent part: • ,
“Although plans to undergo a ceremonial marriage will not automatically ’show a lack of present agreement to enter into common law marriage, Skipworth v. Skipworth, 360 So.2d 975 (Ala.1978), when the necessary intent has never been established and the issue'is as unclear as here, plans to ündérgo a ceremony cannot be overlooked as a factor tending to illuminate the issue.”
466 So.2d at 990. In that case, in which the alleged common-law wife’s testimony was “ambiguous,” the court concluded that the facts that the couple had contemplated^ a formal marriage ceremony and the testimony of the alleged common-law husband that he did not want to enter into a formal marriage were sufficient facts on which a judge could have determined that the parties were not married at common law. 466 So.2d at 989-91. Similarly, in the present case, evidence indicating that the parties were planning a marriage ceremony in Jamaica in March 2012, that Rob did not wish to enter into a formal marriage before that planned formal ceremony, and that he had discussed with multiple wit-, nesses his intention to enter into a prenuptial agreement before he remarried are sufficient facts on which the trial court in the present case could have relied in determining that Kathy and Rob were not married at common law.
This court stated in Bishop v. Bishop, 57 Ala.App. 619, 622, 330 So.2d 443, 445 (Civ.App.1976):
“It is indispensable that the parties must comport themselves in such a manner as to achieve public recognition of thein status - as common-law man and *934 wife. Vinson v. Vinson, 260 Ala. 254, 69 So.2d 431 [(1953)], states that the requirement rests upon reasons of public policy. The Vinson case points out that common-law marriage is based upon presumptive proofs, and that public recognition is the most persuasive of those proofs in demonstrating that marriage rather than a state of mere concubinage has been intended by the parties.
“We cannot dispute that public knowl- . edge of the common-law marriage is the most effective means of insuring that the more casual relations between men and .women are not elevated to the status.of marriage. The marriage relationship may be shown in any way that can be known by others, such as living together as man and wife, referring to each other in the presence of others as being in that’relation, declaring the relation in various types of documents and transactions', sharing household duties and expenses, and’generally engaging in . all of the numerous aspects of day-today ‘ mutual existence of married persons.’ Beck v. Beck, 286 Ala. 692, 246 So.2d 420 [ (1971) ]; Vinson v. Vinson, supra.”
In Vinson v. Vinson, 260 Ala. 254, 257, 69 So.2d 431, 433 (1953), our supreme court observed that “there must be 'more than mere cohabitation to establish a common-law marriage.” In the present case, although it appears undisputed that Kathy and Rob had lived together following the destruction of Kathy’s house in Ashville by a tornado, it was highly disputed regarding whether Kathy and Rob had held themselves out to the public as a married couple.
In Gilbreath v. Lewis, 242 Ala. 510, 7 So.2d 485 (1942), on which the Vinson court relied, our supreme court stated:
•“There was no acknowledgment by either to the public of any" relationship of husband and wife and we find no such recognition by the public. Upon this feature of the case th’e following excerpt from the opinion of the United States Supreme Court in Maryland v. Baldwin, 112 U.S. 490, 5 S.Ct. 278, 280, 28 L.Ed. 822 [(1884)], is here pertinent: ‘But where no such ceremonies are required, and no record is made to attest the marriage, soine public recognition of it is necessary as evidence of its existence. The protection of the parties and their children, and considerations of public policy, require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speakiiig of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them while living together, such as deeds, wills, and, other . formal instruments. Prom such recognition the reputation of being married will obtain among friends, .associates, and acquaintances, which is of itself evidence of a persuasive character. Without it, the existence of the marriage will always be a matter of uncertainty.’ ”
242 Ala. at 514-15, 7 So.2d at 489.
Kathy argues that Rob “said nothing to his Cedar Bluff, Cherokee County ex-wife or her- associates about the marriage before or after the marriage, but did make public his common law inarriage in Etowah and St. Clair counties where he and Kathy lived and worked.” She argues that the trial court’s finding that the testimony indicated that Rob avoided “any prospect of public recognition of a current marital relationship and a public assumption of marital duties” must have been “referring to public recognition of the marriage in Cherokee County where [Rob] • and Kathy did not reside and never resided together.” Although she'argues that the trial court’s finding was plainly and palpably wrong, *935 Kathy fails to cite-any authority indicating that, for a common-law marriage to be valid, the couple need only hold themselves out as husband and wife in the, county, or community, where they reside.
In Borton v. Burns, 11 Ohio Misc. 200, 203, 230 N.E.2d. 156, 158 (Probate Ct.1967), the Probate Court of Highland County, Ohio, stated: “It is true that a common-law marriage, to be valid, can not be secretive. Its very essence requires that the parties be treated and reputed by the public as husband and wife.” In that case, the alleged common-law wife was known as a single person in the city in which she lived and worked during the week; however, she and the alleged common-law husband were treated and reputed as being married in another community, where they lived together on the weekends and during other breaks from the alleged common-law wife’s work. 11 Ohio Misc. at 203-04, 230 N.E.2d at 159. The Ohio court concluded that
“a common-law marriage cannot be a secret thing, but demands that the parties hold themselves out to the entire world that they are husband and wife especially when there is no proof of an express agreement in praesenti. The issuance of a marriage license requires that a public record be made.- Can a common-law marriage be valid if anything less than a holding out to all the public is required?”
11 Ohio Misc. at 205, 230 N.E.2d at 160.
We find the reasoning expressed in Bor-tón to be sound. Like in that case, there was evidence presented in the present case indicating that, in their home and among certain friends and family members, Kathy and Rob were believed to be a married couple. Evidence was also . presented, however, indicating that, among many of Rob’s friends, family members, and business associates, the parties-, intentionally represented ,- themselves as - unmarried. Kathy used her maiden name where she worked, although she claimed to present herself as married in that community, and Rob represented that he was “divorced,” rather than married, on a doctor’s form in Gadsden, where Kathy, claims the parties held themselves out as married as well.
Assuming, without deciding, that Kathy presented clear and convincing evidence indicating that she and Rob represented to certain members of the public that they were husband and wife, that is not all that is required to be considered married at common law. Even taking Kathy’s testimony as true, as the trial court pointed out in its judgment, Rob did not desire for their alleged marriage to be made public for fear that it would affect his business relations with his former wife, and. Kathy testified that she had agreed to keep their alleged marriage quiet for that purpose. The trial court was free to believe the testimony of Rob’s family, friends, and business associates, each of whom testified that Rob had never held himself out as married and, indeed, had commented that he was not in a rush to-get remarried and that he would have a prenuptial agreement in place-before he did so. Because common-law marriages ..are closely scrutinized and the burden of proving the existence of a, common-law marriage is high, we cannot conclude that the trial court erred in determining that Kathy and Rob’s stated intent to keep their marriage a secret to at least one entire community, as argued by Kathy on appeal, negates any assertion that Kathy and Rob had held themselves out to the'“public” as a married couple. Because the evidence in the record supports the trial court’s conclusion that there had been no public recognition of the purported common-law marriage between Kathy and Rob, we affirm the trial court’s judgment.
AFFIRMED.
*936 THOMPSON, P.J., and PITTMAN, THOMAS, ánd DONALDSON, JJ., concur.